

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-08-092-CV

ALL AMERICAN TELEPHONE,        APPELLANTS
INC., NELSON THIBODEAUX,
JAMIE THIBODEAUX, AND
TONY NOWIK

V.

USLD COMMUNICATIONS, INC.        APPELLEES
AND QWEST SERVICES
CORPORATION

------------

## FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### Introduction

Appellants All American Telephone, Inc. (AAT), Nelson Thibodeaux, Jamie

Thibodeaux, and Tony Nowik appeal the trial court's orders granting appellees

USLD Communications, Inc.'s (USLD)[1] and Qwest Services Corporation's (Qwest)[2] traditional and no-evidence motions for summary judgment. In four issues, appellants contend that the trial court improperly excluded their summary judgment evidence and erred by granting summary judgment for appellees on appellants' claims for fraud, tortious interference with contract, and malicious prosecution.[3] We affirm.

---

[1] USLD's full business name is United States Long Distance, Inc. Because the parties use the USLD moniker in their briefs, we will do the same in this opinion.

[2] USLD merged with Qwest. All parties in this appeal have equated Qwest's liability with USLD's liability for the claims appellants have alleged against USLD.

[3] Appellants pled a number of other claims against appellees in their most recent petition filed in the trial court. Although many of these claims were not resolved by any specific summary judgment order, all parties have asserted that a severance order incorporating finality language serves to make the two distinct summary judgment orders that were signed before the severance order final and appealable. Because the trial court purported to dispose of all claims between appellants and appellees and because appellants have limited their criticism of the trial court's disposition to their fraud, tortious interference with contract, and malicious prosecution claims, we will limit our analysis of the trial court's summary judgment disposition to those three claims.

**Background Facts**

**Appellants' and appellees' business relationships**

In 1996, Clay Garey, Tony Nowik, and Jamie Thibodeaux formed AAT as a reseller of residential long-distance telephone services. These individuals comprised AAT's initial board and owned equal shares in the company.[4] Garey served as AAT's initial president;[5] Nowik and Jamie Thibodeaux were not initially involved in AAT's day-to-day operations.

Before merging with Qwest, USLD was a long-distance telephone company that provided services for other companies to resell to consumers. AAT was one of those reselling companies. USLD generated call records related to AAT's customers' calls; it eventually forwarded these records back to AAT through a Bulletin Board System (BBS).[6]

---

[4] Jamie Thibodeaux is the wife of appellant Nelson Thibodeaux. Nelson gained a proxy through Jamie's shares to vote about matters related to AAT's business.

[5] Garey ran AAT's business because, according to Nowik, Garey had prior experience in the communications business.

[6] The BBS was an electronic interface between USLD and its resale company customers. It allowed the resale companies to determine the identities of their active customers.

3

USLD contracted with Multimedia Long Distance, Inc. (Multimedia), also run by Garey,[7] which "rated" call records sent by USLD on AAT's customers to determine the amount to charge the customers for those calls.[8] Multimedia billed AAT for the wholesale value of the calls, and once AAT paid Multimedia, Multimedia was supposed to make its own payments to USLD. USLD's contract with Multimedia provided that if Multimedia failed to properly pay USLD, USLD could terminate its services to Multimedia.[9]

Once the calls had been "rated" by Multimedia, AAT used a company named Hold Billing Services (Hold) to collect payment from AAT's customers.[10] Hold advanced funds to AAT based on long-distance calls made by AAT's customers, and then Hold sent monthly bills to AAT's customers for those calls through the customers' local telephone companies. After receiving payment for

---

[7] The record contains a copy of a 1995 USLD contract with Multimedia; the contract is signed by Garey as Multimedia's president.

[8] Nowik testified during a deposition that Garey's use of Multimedia as a third party to contract with USLD to rate AAT's calls was not part of AAT's original business plan. In their original petition, appellants asserted that Garey "inserted his company, Multimedia, into the contractual arrangements . . . for no benefit to AAT whatsoever and without shareholder or director approval."

[9] USLD never had a direct contractual relationship with AAT. In fact, during a deposition, a USLD executive testified that he did not know that AAT, not Multimedia, was ultimately reselling its long-distance services until 1998.

[10] According to Nelson Thibodeaux, by early 1998, AAT had customers in all fifty states and its billings exceeded $1,000,000 per month.

4

the long-distance telephone services from the customers' local companies, Hold reconciled amounts it had advanced to AAT with the actual money it had collected.

To minimize the risk that it might not receive payment equal to the advances it had made to AAT, Hold obtained a security agreement from AAT that attached to AAT's accounts and its customer base. The security agreement allowed Hold, upon default, to require AAT to deliver all of its books and records relating to its customers; it also allowed Hold to "take control of all . . . payments on [AAT's accounts] and apply them against the obligation."

**The trial court's proceedings**

In 1998, USLD began to allege that Multimedia owed it more than $2 million for its long-distance services. After Garey informed Nowik and Jamie Thibodeaux of this allegation and of AAT's potential responsibility to pay the money, they demanded to view AAT's records.

Garey refused to give access to the records and stopped communicating with Jamie Thibodeaux and Nowik; thus, in June 1998, AAT, Jamie Thibodeaux, and Nowik filed their original petition against Garey. Around that same time, because AAT did not agree to pay Multimedia's debts, USLD blocked Multimedia's (and therefore AAT's) access to the BBS. However,

5

according to Nelson Thibodeaux, USLD continued to forward call records to Garey for rating and billing.

In their June 1998 petition, appellants[11] sought a temporary restraining order to prevent Garey from altering AAT's records or distributing AAT's assets; they also sought immediate access to the records and damages for Garey's alleged misconduct.[12] Appellants obtained a temporary restraining order against Garey; however, Garey obtained a temporary restraining order prohibiting appellants from changing AAT's records or disposing of AAT's funds.

In July 1998, USLD intervened in appellants' suit against Garey to collect the more than $2 million allegedly owed to it by AAT.[13] The intervention petition named Nelson Thibodeaux as a third-party defendant; it also requested the trial court to appoint a receiver to take possession of AAT's assets because

---

[11] Appellant Nelson Thibodeaux did not join in the original petition.

[12] The claims that appellants asserted against Garey included allegations that he failed to provide AAT's shareholders with an accounting of the business, failed to pay dividends to shareholders, wrongly used AAT's funds for his personal benefit, usurped AAT's corporate opportunities, wrongly used Multimedia to overcharge AAT for services obtained from USLD on AAT's behalf, and otherwise improperly managed AAT's business in several respects.

[13] USLD attached an affidavit and business records to its intervention petition allegedly substantiating the money owed to it by AAT. While USLD has obtained a summary judgment on its affirmative claim for the payment of the debt, that summary judgment is not yet final, and it is not a part of this appeal.

6

of the "unrest and chaos" caused by the countervailing temporary restraining orders.

The same month that USLD filed its intervention petition, appellants and Garey entered into a settlement agreement in which AAT assumed all of Multimedia's liabilities to USLD and also assumed Multimedia's contract with USLD.[14] The settlement agreement caused the resignation of Garey as AAT's president and Jamie Thibodeaux's and Nowik's purchases of Garey's AAT shares for $270,000.

Also in July 1998, the Federal Communications Commission (FCC) issued a Notice of Apparent Liability for Forfeiture (for more than $1 million) against AAT. The FCC alleged that AAT had committed "particularly egregious" violations of federal law by changing the long-distance services of thirteen customers without their permission through forging those customers' signatures on Letters of Authorization (LOAs).[15] In the summer of 1998, the government seized most of AAT's files under a warrant.

---

[14] USLD's counsel informed the court that its claims remained pending and that it was not a part of the settlement.

[15] The practice of switching a long-distance customer's service without the customer's permission is known as "slamming." In an Order of Forfeiture, the FCC eventually fined AAT $920,000 for its "slamming" practices.

7

In August 1998, Hold's counsel sent appellees' counsel a letter asserting that AAT owed Hold more than $750,000, noting that appellees were holding AAT's call records because of appellees' dispute with AAT and, under Hold's security agreement with AAT, demanding "immediate delivery to [Hold] of all call records whatsoever attributable to AAT or its customers."[16] Following appellees' receipt of that letter, they and Hold entered into a Release and Indemnity Agreement. The agreement recited that Hold had asserted a claim to AAT's call records and that Hold had warranted that their claim was superior to claims of other entities, including AAT. It then provided that appellees would deliver AAT's call records to Hold and that Hold would collect money on AAT's accounts.

In September 1999, the federal government filed mail fraud charges against Patrick Thompson (AAT's vice president and chief financial officer at that time), alleging that Thompson led AAT in a scheme to "defraud telephone customers . . . by means of false, fictitious, and fraudulent pretenses," such as

---

[16] The letter stated that the demand was being made in lieu of Hold filing a lawsuit against appellees, and it represented that "[s]uch action is expressly authorized by AAT under the Security Agreement as a remedy of [Hold] against the secured assets of AAT." It also explained that Hold would deliver twenty percent of the proceeds from billing on the call records to the registry of the trial court pending resolution of the case between appellees and appellants.

deceptive sweepstakes[17] used to change customers' long-distance services to AAT. Thompson pled guilty and signed a "factual resume" in which he admitted to taking these actions and defrauding approximately 350,000 customers.

In February 2001, the federal government indicted Garey for charges similar to those that Thompson had pled guilty to. In May 2002, the government indicted Nelson Thibodeaux, Nowik, and others connected to AAT's business for similar crimes.[18] In November 2002, a jury trial began on the criminal case against Nowik and Thibodeaux; they were both acquitted.

In November 2003, through a fax from appellees' counsel, appellants discovered the existence of the agreement between USLD and Hold regarding Hold's execution of its security agreement on AAT's accounts. USLD had not

---

[17] Among other facts, the government asserted that Thompson committed fraud because AAT's sweepstakes entrants were not told that their telephone service could be switched or that charges could apply to such a switch, that AAT falsely told such customers that they could be switched back to their previous long-distance carriers, and that AAT "hid the physical location of its offices" to avoid customer complaints. Nowik testified during his deposition that his independent business helped AAT gain customers by using such sweepstakes entries; he stated, however, that his sweepstakes entry forms complied with the law.

[18] In the remainder of this opinion, "Thibodeaux" will refer to Nelson rather than Jamie unless we expressly indicate otherwise.

produced the agreement to appellants or to prosecutors[19] before Nowik's and Thibodeaux's trial.

In December 2003, appellants amended their petition to assert claims against USLD.[20] In May 2004, USLD filed its motion for summary judgment on AAT's claims against it. In that motion, USLD particularly alleged that AAT had no evidence to prove elements of their fraud and tortious interference with contract claims.

In July 2004, AAT filed its objections[21] and its response to USLD's motion for summary judgment. AAT attached deposition excerpts and affidavits from Garey and Thibodeaux. It contended that fact issues precluded summary judgment on its tort claims.

Appellees filed objections to the evidence appellants had attached to their summary judgment response. Specifically, appellees objected to Garey's and Thibodeaux's affidavits (and exhibits attached to those affidavits), asserting

---

[19] USLD's involvement with the prosecution of Nowik and Thibodeaux is detailed below.

[20] Appellants eventually amended their petition again to assert claims against Qwest.

[21] Appellants have not raised any issue on appeal related to their objections to the trial court about appellees' summary judgment evidence. Thus, we will not detail the substance of those objections.

10

that the affidavits lacked foundation, contained inadmissible hearsay and vague statements, and were not based on personal knowledge.

In January 2005, Qwest filed its motion for summary judgment, contending in part that appellants had no evidence to support three elements of their malicious prosecution claim.  In February 2005, appellants filed their fourth amended petition[22] against Garey, Multimedia, and appellees.  That petition stated that "USLD led AAT to believe that it would continue providing services to AAT customers provided AAT would pay for services due and attributable to the business of AAT," claimed that USLD prohibited AAT from accessing call records, asserted that USLD and Hold conspired to prevent the release of AAT's call records, and alleged that USLD "stole AAT's customer base."  Finally, it contended that USLD portrayed itself as a victim of fraud to federal prosecutors, resulting in Nowik's and Thibodeaux's prosecutions.

On April 5, 2005, appellants filed their response to Qwest's summary judgment motion.  As to appellants' malicious prosecution claim, the response argued that there was a "course of communication between USLD and the United States Attorney's Office beginning in at least June 1999" wherein USLD

---

[22] This is appellants' most recent petition.

portrayed itself as a victim to AAT's allegedly fraudulent billings in 1998 (at which time appellants had no control over AAT's customers or its billing).

On April 28, 2005, the trial court granted USLD's traditional motion for summary judgment and also its no evidence motion for summary judgment on AAT's fraud and tortious interference with contract claims, among other claims. The trial court concurrently sustained two of appellants' objections to USLD's summary judgment motion, and it sustained all of the objections that USLD had made to portions of appellants' summary judgment evidence.[23]

In July 2005, the trial court stayed its proceedings because AAT filed a bankruptcy petition in federal court. After the trial court resumed its case more than two years later, in October 2007, USLD and Qwest jointly filed a motion for summary judgment on appellants' remaining claims against them.

In January 2008, the trial court granted appellees' motion for summary judgment on appellants' malicious prosecution claim. The next month, the

---

[23] On appeal, appellants challenge only the trial court's exclusion of portions of Nelson Thibodeaux's affidavit and the exhibits attached to that affidavit; they do not challenge the trial court's exclusion of other summary judgment evidence that they offered. Thus, we will not consider such unchallenged and excluded evidence (including Garey's affidavit in its entirety) in determining the issues raised by this appeal. *See Little v. Needham*, 236 S.W.3d 328, 331 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Inglish v. Prudential Ins. Co. of Am.*, 928 S.W.2d 702, 706 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (op. on reh'g).

12

court severed all of appellants' claims against appellees from the claims remaining in the suit.[24] Appellants timely filed notice of this appeal.

## Summary Judgment Standards of Review

### General summary judgment principles

We review summary judgments de novo. *Gray v. Nash*, 259 S.W.3d 286, 289 (Tex. App.—Fort Worth 2008, pet. denied). The function of summary judgment practice is not to deprive a litigant of the right to a jury trial, but to eliminate patently unmeritorious claims and untenable defenses. *Gulbenkian v. Penn*, 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952). Summary judgment is proper when parties do not dispute the relevant facts. *Havlen v. McDougall*, 22 S.W.3d 343, 345 (Tex. 2000).

When a party moves for summary judgment on no-evidence and on traditional grounds, we will first review the trial court's judgment under the no-evidence standards. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex. 2004). If an appellant failed to produce more than a scintilla of evidence under those standards, then there is no need to analyze whether an appellee's summary judgment proof satisfied the burden related to traditional summary judgment motions. *Id.*

---

[24] The severance order recited that all of appellants' claims against appellees had been fully disposed of and were final and appealable.

13

**No-evidence summary judgment motions**

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *see Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied).

Less than a scintilla of evidence exists when the evidence is so weak that it does nothing more than create a mere surmise or suspicion of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of

evidence exists when the evidence would enable reasonable and fair-minded people to reach different conclusions.  *See Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008); *Ford Motor Co.*, 135 S.W.3d at 601.

## The Propriety of the Trial Court's Summary Judgment Orders

In their third and fourth issues, appellants assert that the trial court erred by granting appellees' no-evidence summary judgment motions on their fraud, tortious interference with contract, and malicious prosecution claims.

**Fraud**

In the first part of their third issue, appellants argue that the trial court erred by granting appellees' no-evidence summary judgment motions on their fraud claims.

A party commits fraud by (1) making a false, material misrepresentation (2) that the party either knows to be false or asserts recklessly without knowledge of its truth (3) with the intent that the misrepresentation be acted upon, (4) and the person to whom the misrepresentation is made acts in reliance upon it (5) and is injured as a result.  *W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 776 (Tex. App.—Fort Worth 2008, pet. denied); *see Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (op. on reh'g).  In its motion for summary judgment

filed in May 2004, USLD asserted that AAT had no evidence of any of these elements.

Appellants claim that appellees committed fraud by falsely representing that they would continue to provide services to AAT pending reconciliation of AAT's account with USLD. Appellants rely on Thibodeaux's affidavit that they attached to their summary judgment response, which contained the statement,

> AAT was willing at all times to pay any and all toll charges directly to USLD provided it had not already paid the same to MULTIMEDIA. During discussions with USLD representatives concerning the amounts attributable to AAT's un-billed and undelivered call records, and prior to USLD notifying that it was terminating its relationship with AAT, AAT was inexplicably denied access to the [BBS]. The BBS is the lifeline to any reseller as it enables a reseller to determine who its existing customers are. *I was not particularly concerned at that time because USLD, by and through its attorneys and representatives, continued to assure us that AAT would continue to be serviced by USLD pending a reconciliation [of] AAT's account. I, as a representative of AAT, relied upon this representation and took no action to solidify the identity of [the] current customer base for the purpose of moving the same to another carrier, locate another carrier, or locate another billing company because I was confident the business relationship would continue based on the representations of USLD.* [Emphasis added.]

Appellees claim that Thibodeaux's statement is insufficient to raise any genuine fact issue on appellants' fraud claim because (1) it is vague and lacks sufficient foundation (because it does not state when the statement was made or who made it); (2) it is, at most, a promise of future performance with no evidence

16

of a present intention not to perform; and (3) AAT could not have reasonably relied on the statement because Multimedia's agreement with USLD (for which AAT assumed responsibility through its settlement agreement with Garey) allowed USLD to withhold services if it was not paid.

**The foundation for Thibodeaux's statement**

In the trial court, appellees specifically objected to the portion of Thibodeaux's affidavit that is italicized above. They argued,

> These statements are not readily controvertible because they are too vague to even determine who at USLD allegedly made the statements. Nor are these statements supported by a shred of documentary evidence . . . . They do not identify the speaker, the content of the alleged representations and assurances, or even the person to whom they were made. Nor does Thibodeaux ever do so in his affidavit. . . . [The statements] do not meet the standards for summary judgment evidence and should be disregarded.

The trial court sustained appellees' objection and specifically excluded the italicized portion from its consideration. Appellants contend that the court's exclusion of the statement was improper.

Inclusion or exclusion of summary judgment evidence is a matter committed to the trial court's discretion. *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997). We review a trial court's ruling sustaining or overruling objections to summary judgment evidence for an abuse of that discretion. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 567

17

(Tex. App.—Fort Worth 2008, pet. denied); *Reynolds v. Murphy*, 188 S.W.3d 252, 259 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g), *cert. denied*, 549 U.S. 1281 (2007).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986); *see Longoria*, 938 S.W.2d at 31. Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 242. Under the abuse of discretion standard, an appellate court should "uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling." *Reynolds*, 188 S.W.3d at 259; *see Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Affidavits in support of summary judgment must set forth such facts as would be admissible in evidence at trial. Tex. R. Civ. P. 166a(f); *Longoria*, 938 S.W.2d at 30.

In *Brownlee v. Brownlee*, the Texas Supreme Court considered Barbara Brownlee's motion for summary judgment on her claim for a breach of a

18

settlement agreement connected to the divorce of her ex-husband, Michael. 665 S.W.2d 111, 111 (Tex. 1984). In opposition to the motion, although Michael admitted the existence of the settlement agreement and his failure to make payments thereunder, he submitted an affidavit that contained a general statement that the agreement had been amended. *Id.* at 112. He contended that the general statement regarding amendment was sufficient to raise a fact issue and avoid summary judgment. *Id.* The supreme court disagreed, holding that Michael's

> affidavit did not set forth such facts as would be admissible in evidence, as required by Rule 166-A(e), TEX. R. CIV. P. If this had been a trial on the merits and the only thing to which Michael testified was that his obligation had been modified, the trial court would have been required to instruct a verdict against him. Michael's affidavit opposing Barbara's motion for summary judgment *should have gone further and specified factual matters such as the time, place, and exact nature of the alleged modification*.

*Id.* (emphasis added).

Similarly, in *Fraga v. Drake*, Fraga, who had purchased a home that subsequently needed substantial repairs, appealed a summary judgment on his fraud claim that was granted in favor of the home's sellers. 276 S.W.3d 55, 58 (Tex. App.—El Paso 2008, no pet.). The trial court sustained objections to portions of Fraga's summary judgment evidence that he attached to his response. *Id*. at 59–61. Particularly, the trial court excluded a portion of

19

Fraga's affidavit stating, "Then, when I was not making the monthly note payments [on the home] because they told me I could use the money for the repairs instead, and they made their confession to me in February 2002, I then filed suit." *Id.* at 61, 63. On appeal, Fraga contended that the trial court abused its discretion by excluding the statement. *Id.* at 59–60. In rejecting Fraga's contention, the El Paso court explained that the sellers

> objected to [the statement] on the grounds that it failed to specify which defendant made what statement, it failed to state the alleged "confession," and it was conclusory. As was the case with [a previously-excluded statement], the affidavit does not set forth the statements made by the defendants which Fraga characterizes as a confession. This statement is conclusory because it does not relate the underlying facts which support the conclusion. The trial court did not abuse its discretion i[n] sustaining [the sellers'] objections to [the statement].

*Id.* at 63.

Finally, in *Wilson v. Thomason Funeral Home, Inc.*, the Austin court of appeals reviewed a trial court's decision to grant summary judgment against a family's fraud claim related to a funeral home's allegedly deficient preparation of a body for a viewing. No. 03-02-00774-CV, 2003 WL 21706065, at *1–2, 7–9 (Tex. App.—Austin July 24, 2003, no pet.) (mem. op. on reh'g). To support the reliance element of their fraud claim, the family relied solely on an affidavit from one of the family members that stated,

20

I was present when my wife's body was first made available for viewing by the family. A representative from Thomason Funeral Home told us that, because of the procedure, they had trouble with my wife's eyes. Because Thomason led me to believe that they had done all they could do for my wife's eyes, I did not complain. I paid for the services provided by Thomason Funeral Home because it was my understanding based on Thomason Funeral Home representative's implication to me that they had done the best job they could given the procedure. Had I been told either that my wife's eyes had been completely removed, or that Thomason had breached any standard of care with respect to preparing my wife's body for burial, I never would have gone through with the contract.

*Id.* at *8. The Austin court rejected the affidavit's capability to defeat the funeral home's no-evidence summary judgment motion on the family's fraud claim, reasoning that an

affidavit must set forth such facts as would be admissible at a conventional trial on the merits[.] Here, the only representation, as set forth in the affidavit, is that an unnamed Thomason representative had difficulty with the eyes "because of the procedure." The affidavit implies that a Thomason representative said that he did all that he could, but does not unequivocally aver that anyone with Thomason made the statement. This does "no more than create a mere surmise or suspicion" of fact, which is less than a scintilla of evidence. . . . *The allegations concerning statements of an unidentified representative of Thomason are insufficient to create a fact issue because they lack the necessary factual specificity and create no more than a suspicion of fact*.

. . . .

Because the affidavit lacks sufficient factual specificity about Thomason's representations [and] creates no more than "a mere surmise or suspicion of fact," . . . appellants have not presented more than a scintilla of evidence on [their fraud claim].

21

*Id.* at *8–9 (citations omitted) (emphasis added); *see also Southtex 66 Pipeline Co. v. Spoor*, 238 S.W.3d 538, 542–43 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (explaining that "an affidavit must contain specific factual bases, admissible in evidence and upon which conclusions are drawn. . . . Statements made in the affidavit need factual specificity such as time, place, and the exact nature of the alleged facts") (citations omitted); *B & H Aircraft Sales, Inc. v. Engine Components, Inc.*, 933 S.W.2d 653, 656 (Tex. App.—San Antonio 1996, no writ) (affirming the trial court's decision to grant summary judgment because, in part, an affidavit was not specific enough to raise a fact issue); *Princess Enters., Inc. v. Superstar Amusements, Inc.*, 718 S.W.2d 40, 43 (Tex. App.—Dallas 1986, no writ) (indicating that a plaintiff in a fraud claim must "lay a foundation outlining exactly what specific representations were made and relied upon").

We find these cases instructive about our decision in this case. Thibodeaux's statement in his affidavit (as italicized above) generally communicates only that someone out of a number of attorneys and representatives from USLD told someone out of a number of people connected to AAT that AAT would "continue to be serviced" pending a "reconciliation" of AAT's account. The affidavit does not provide any detail as to the particular identity of the speaker or who heard the statement, does not provide any detail

22

as to when in the course of USLD's dispute and negotiations with AAT the statement was made, and does not provide any detail concerning the specific statement that was made and what, if any, conditions attached to the "reconciliation" of AAT's account.

Because the impetus behind a fraud claim is a specific and false representation, because summary judgment affidavits require detail and specificity, and because Thibodeaux's statement lacks any such specificity as to USLD's alleged representation, we hold that the trial court did not abuse its discretion by striking the italicized portion of his affidavit detailed above, as it created only a "surmise or suspicion" of the matters it asserted.[25]  *See* Tex. R. Civ. P. 166a(f); *Brownlee*, 665 S.W.2d at 111–12; *Fraga*, 276 S.W.3d at 63; *Paciwest, Inc.*, 266 S.W.3d at 567; *Strange*, 256 S.W.3d at 776.  Since appellants rely solely on Thibodeaux's statement to support the false representation element of their fraud claim and because we hold that the trial court did not err in excluding the statement, we also hold that the trial court did not err in granting the no-evidence summary judgment motion for appellees on

---

[25] We note that over eight months passed from the time that USLD made its objections to Thibodeaux's affidavit to the time the trial court sustained the objections.  During that time, appellants did not amend Thibodeaux's affidavit or file any documents to provide further detail about USLD's alleged misrepresentation.  *See* Tex. R. Civ. P. 166a(f) (permitting supplementation of affidavits).

that claim.  *See* Tex. R. Civ. P. 166a(i); *Grant*, 73 S.W.3d at 215. We therefore overrule the portion of appellants' third issue that corresponds to the trial court's decision to grant summary judgment against them on their fraud claim.[26]

**Tortious interference with contracts**

In the remaining part of their third issue, appellants contend that the trial court improperly granted appellees' no-evidence summary judgment motions on their tortious interference with contract claims.

Texas law protects existing contracts from interference.  *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 665–66 (Tex. 1990).  Thus, a party to a contract has a cause of action for tortious interference against any nonparty to the contract who wrongly induces another contracting party to breach the contract.  *Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995).

The elements of the cause of action for tortious interference are:  (1) the existence of a contract subject to interference, (2) willful and intentional

---

[26] Because we hold that the trial court did not abuse its discretion in its evidentiary decision and that the exclusion of the italicized portion of Thibodeaux's affidavit justified the trial court's summary judgment decision on appellants' fraud claim, we decline to address the other contentions raised by appellees that could support the trial court's decision on that claim.

interference (3) that proximately causes damage, and (4) actual damage or loss. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *SITQ E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 647 n.7 (Tex. App.—Fort Worth 2003, pet. denied). USLD asserted in the trial court that AAT had no evidence to support any of these elements.

Appellants contend that USLD interfered with AAT's contracts with its customers by (1) delivering AAT's call records to Hold instead of permitting AAT to access the records so that it could identify its customers, and (2) switching some of AAT's customers off of AAT's account without its permission. Appellees assert that appellants' summary judgment evidence is too vague and conclusory to support appellants' claim. We agree with appellees.

Thibodeaux's affidavit, on which appellants again rely on appeal to substantiate their tortious interference claim, states that in 1998, "AAT had contracts to provide long distance services with over one million (1,000,000) customers. . . . AAT would acquire customers via a third-party marketing company, customers would be switched to the USLD network, [and] call records would be forwarded weekly from USLD to AAT via the [BBS] or tape." Beyond generally stating that a million contracts existed, the affidavit does not provide any further detail as to specific terms or even the general legal effect

25

of such contracts, nor does it attach any executed or nonexecuted contract to serve as an exemplar of such contracts' provisions.

For a plaintiff to maintain a tortious interference claim, it must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract. *See John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 730 (Tex. App.—Austin 2000, pet. denied); *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139–40 (Tex. App.—Eastland 1992, writ denied); *see also Dunn v. Calahan*, No. 03-05-00426-CV, 2008 WL 5264886, at *3 (Tex. App.—Austin Dec. 17, 2008, pet. denied) (mem. op. on reh'g) (explaining that there "must be some act interfering with a contract or act persuading a party to a contract to breach; for example, offering better terms or other incentives"). To do so, the plaintiff must present evidence that some obligatory provision of a contract has been breached. *See N.Y. Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.) (rendering judgment against a tortious interference claim because there was no breach of the underlying contract); *Archives of Am., Inc. v. Archive Litig. Servs., Inc.*, 992 S.W.2d 665, 667–68 (Tex. App.—Texarkana 1999, pet. denied).

When the plaintiff fails to present such evidence, summary judgment against the tortious interference claim is proper. *See Stephan v. Baylor Med.*

26

*Ctr. at Garland*, 20 S.W.3d 880, 891 (Tex. App.—Dallas 2000, no pet.). General claims of interference with a business relationship are insufficient to establish a tortious interference with contract claim. *See Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 265 (Tex. App.—Corpus Christi 2006, pet. denied); *see also Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 690 (Tex. 2006) (signaling that tortious interference with a contract and tortious interference with a business relationship are separate torts).

While the summary judgment evidence indicates that AAT had customers and Thibodeaux's affidavit generally asserts that AAT had contracts with those customers, appellants did not produce any evidence that appellees' delivery of AAT's call records to Hold or its switching of AAT's customers' telephone service violated any particular term of those contracts or caused either AAT or the customers to breach the contracts. Instead, the allegations in appellants' brief and their reply brief focus on the business relationship that AAT had with its customers, rather than the contracts it had with them.[27] While appellants

---

[27] In their brief, appellants contend (with citations to the record omitted),

> The USLD/[Hold] Agreement demonstrates that USLD made a conscious decision to deliver AAT's call records to an entity other than AAT, and that none of the funds collected through those

assert in their reply brief that appellees' conduct "necessarily interfered with AAT's contractual right to receive payment from its customers," the summary judgment evidence fails to establish beyond any surmise or suspicion that any such right was contractual in nature.[28]  *See Kindred*, 650 S.W.2d at 63.

Thus, we hold that the evidence offered by appellants in the trial court failed to raise any genuine issue of material fact that appellees interfered with any contract that was subject to such interference and that the trial court properly granted appellees' motion against appellants' tortious interference claim.[29]  *See Stephan*, 20 S.W.3d at 891; *John Paul Mitchell Sys.*, 17 S.W.3d

---

records would be paid to AAT.  Giving the call records to [Hold] and agreeing that [Hold] would not pay any of the proceeds to AAT, effectively prevented AAT from identifying and billing its customers. . . .

USLD's conduct in preventing AAT from identifying and billing its customers, and its conduct in switching AAT's customers to another carrier, proximately caused AAT injury because it could not itself move those customers to a new carrier and could not, therefore, maintain a business relationship with them.

[28] We note that Jamie Thibodeaux testified during her deposition that she had never seen any contracts executed by AAT and that, to her knowledge, Nelson had not reviewed any such contracts either.

[29] Because we hold that Nelson Thibodeaux's affidavit and the remaining summary judgment evidence is not sufficient to maintain appellants' tortious interference claim, we decline to address the other arguments raised by both parties pertaining to the trial court's adjudication of that claim.  Also, we express no opinion as to whether USLD's actions in relation to AAT's billing records and its customer base could have entitled appellants to relief on any

at 730; *ACS Investors, Inc.*, 943 S.W.2d at 430. We therefore overrule the portion of appellants' third issue that relates to their tortious interference claim.

**Malicious prosecution**

In their fourth issue, appellants assert that the trial court erred by granting appellees' summary judgment motions on Nowik's and Thibodeaux's malicious prosecution claims.

Claims for malicious prosecution create a tension between the societal interest in punishing crimes and the individual interest in protection from unjustifiable criminal prosecution; we are therefore constrained to the exact prerequisites for liability when reviewing such claims. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 520 (Tex. 1997); *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex. 1994). To prevail on a malicious prosecution claim, a plaintiff must establish (1) the commencement of a criminal prosecution against the plaintiff, (2) causation of the action by the defendant, (3) termination of the prosecution in the plaintiff's favor, (4) the plaintiff's innocence, (5) the absence of probable cause for the proceedings, (6) malice in filing the charge, and (7) damage to the plaintiff. *Richey*, 952 S.W.2d at 517; *Dangerfield v. Ormsby*, 264 S.W.3d 904, 910 (Tex. App.—Fort Worth

---

other legal theories other than tortious interference with contracts.

2008, no pet.). Appellees moved the trial court for a no-evidence summary judgment on the ground that appellants had no evidence of causation; appellees maintain this contention on appeal.

For a plaintiff to show that a defendant caused a malicious prosecution, it must demonstrate that the defendant initiated or procured the prosecution. *See Lieck*, 881 S.W.2d at 292–93; *Dangerfield*, 264 S.W.3d at 910. A defendant initiates a prosecution when it files formal charges against the plaintiff. *See Lieck*, 881 S.W.2d at 293; *Dangerfield*, 264 S.W.3d at 910. A defendant procures a prosecution when its

> actions were enough to cause the prosecution, and but for [its] actions the prosecution would not have occurred. [The defendant] does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false.

*Lieck*, 881 S.W.2d at 293; *see Dangerfield*, 264 S.W.3d at 910 (explaining that to establish procurement, the defendant's desire must be the "determining factor in the official's decision to commence the prosecution").

Thus, "proof that a complainant has knowingly furnished false information is *necessary* for liability when the decision to prosecute is within another's discretion. But such proof is not *sufficient*." *King v. Graham*, 126 S.W.3d 75, 76 (Tex. 2003). Instead, "there must be proof that the prosecutor acted based

30

on the false information and that but for such false information the decision [to prosecute] would not have been made." *Id.* Therefore,

> a person who knowingly provides false information to the grand jury or a law enforcement official who has the discretion to decide whether to prosecute a criminal violation cannot be said to have caused the prosecution if the information was immaterial to the decision to prosecute. If the decision to prosecute would have been made with or without the false information, the complainant did not cause the prosecution by supplying false information.

*Id.* at 78; *see First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 470 (Tex. 2004). The plaintiff is not required to present direct evidence such as testimony from a prosecutor to establish causation in a malicious prosecution claim. *See In re Bexar County Criminal Dist. Attorney's Office*, 224 S.W.3d 182, 186 (Tex. 2007) (orig. proceeding).

Appellants do not assert that appellees initiated Nowik's and Thibodeaux's prosecutions by filing a formal complaint. Instead, appellants assert that appellees procured the prosecutions by providing false information and withholding material information from the government.

Specifically, in appellants' most recent petition, they alleged that appellees maliciously prosecuted them by stating, "As a further tool used to attempt to overwhelm AAT shareholders, USLD representatives contacted the United States Attorney's office and portrayed USLD as a victim of some scheme to defraud. These allegations were false and malicious." In their

31

summary judgment responses at trial and in their briefs on appeal, appellants have specified that their malicious prosecution claim is based on (1) USLD's counsel Robert Barbee's speaking with assistant United States attorney Ronald Eddins in 1999, (2) Barbee's forwarding Eddins a copy of USLD's intervention petition that contained allegedly untrue statements and portrayed USLD as a victim, (3) Barbee's arranging an interview between a USLD employee and Eddins,[30] and (4) Barbee's nondisclosure to Eddins or AAT (despite AAT's written discovery request) of USLD's agreement with Hold, which would have shown Eddins that AAT did not have control of its billings in the time period relevant to Eddins's prosecution decision.

Assuming that the details underlying each of these assertions about USLD's and Barbee's actions are true, appellants still failed to present more than a scintilla of evidence that Nowik and Thibodeaux would not have been prosecuted without such actions; they failed to explain how the reversal of USLD's actions would have signaled their exculpation to Eddins. While appellants' brief contains a conclusory statement that USLD's alleged misrepresentations "drove the Justice Department into an unwarranted prosecution of Thibodeaux and Nowik," it does not explain how the alleged

---

[30] Appellants attached excerpts from Barbee's deposition to substantiate Barbee's involvement in Thibodeaux's and Nowik's prosecutions.

misrepresentations were the "but-for" cause of the particular charges that Thibodeaux and Nowik faced in their indictment and in their federal criminal trial. *See King*, 126 S.W.3d at 78.

Appellants' summary judgment response to Qwest's motion for summary judgment on their malicious prosecution claims, on which appellants rely through a record reference in the portion of their brief concerning this causation issue, did not include a copy of the indictment against Nowik and Thibodeaux or any of the filings in their criminal case. It also did not include a transcript from their trial or any other document to establish the foundation of the government's prosecution against them or directly or circumstantially indicate that the government's case would have been weakened if USLD had acted differently.

Although Thibodeaux's and Nowik's affidavits included broad, one-sentence assertions about the nature of the charges against them,[31] appellants'

---

[31] Thibodeaux's affidavit stated that his charges "arose out of alleged fraudulent billings by AAT including the period from July 1998 through 1999." Nowik's affidavit contained a similar statement. Although appellants' reply brief asserts that Thibodeaux and Nowik "could not be guilty of wiring AAT billing revenues between bank accounts if they never had control of the company during a time when AAT received billing revenues," appellants have not cited any evidence in the record establishing that the criminal charges against Thibodeaux and Nowik were limited to the time that USLD and Hold controlled AAT's billing. Thus, they have not established that USLD's agreement with Hold is material to all of those charges.

33

summary judgment response also included as evidence a June 8, 1999 letter from Eddins to Barbee (although his name is misspelled as "Barkee") indicating that Eddins received information apart from USLD's information in his prosecution of Nowik and Thibodeaux.[32] *See King*, 126 S.W.3d at 79 ("[The plaintiffs] argue in essence that causation can be inferred from the falsity of [the defendant's] statements. While such an inference might be drawn *in a case in which the only information the official relied on in deciding to prosecute was false*, that is not the situation in this case.") (emphasis added); *see also Weaver v. Bell*, No. 03-04-00169-CV, 2005 WL 1364046, at *6 (Tex. App.—Austin June 10, 2005, no pet.) (mem. op.) (holding that the plaintiff did

---

[32] Specifically, Eddins's letter to Barbee stated,

I appreciate your service of the lawsuit against AAT and others. I wish that we could provide, directly to all victims, the documents gathered in our investigations. However, I'm sure you are aware that the law prohibits us from sharing investigative results with private litigants, even victims.

I point out that all documents obtained by federal authorities during an investigation remain the property of those from whom received. We make efforts to give the owners access to their records needed in connection with civil lawsuits.

Should your client, USLD, desire that you proceed to obtain the records from the owners, we would always make those records available to the owners so that our investigation would not hinder private litigations.

not procure the defendant's prosecution because, in part, the evidence showed that police investigated and interviewed other witnesses before deciding to arrest the plaintiff).  Appellants' summary judgment response at trial also contained documents filed in Patrick Thompson's criminal case relating that the government was concerned about AAT's activities that occurred as far back as 1996, which was well before USLD's asserted cooperation with the government.

We conclude and hold that the isolated, general statements in Nowik's and Thibodeaux's affidavits regarding the substance of the charges against them, when considered with the remainder of their summary judgment evidence and when viewed in the light most favorable to them, do not create more than a surmise or suspicion that the absence of USLD's statements and the disclosure of USLD's agreement with Hold would have changed the government's prosecution decision. *See King*, 126 S.W.3d at 78; *Kindred*, 650 S.W.2d at 63 (explaining that when "the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence"); *Hubbard v. Shankle*, 138 S.W.3d 474, 480 (Tex. App.—Fort Worth 2004, pet. denied).

Finally, appellants rely on a portion of Nelson Thibodeaux's deposition testimony to establish causation for their malicious prosecution claims. When asked during his deposition to explain the connection between USLD's actions and his indictment, Thibodeaux stated,

> I spoke to the U.S. Postal Inspector after this was over. He indicated to me had he have known [USLD] was the one solely involved with customers on line after 1998, *that it may have changed his mind about recommendations to the Assistant U.S. Attorney* . . . .
>
> . . . .
>
> So sir, I was indicted through 1999. And, once again, since we went out in September of '98 because of your actions here and Hold's actions, I don't see how we could have been indicted through '99 unless you, sir, or your company or somebody were billing customers and the U.S. Attorney's Office thought we were still somehow or another involved in some nefarious activities, because we couldn't control who was being billed. We had no idea.
>
> So when you refer to yourself as a victim and the U.S. Attorney believes that, then I think it *helped motivate* his indictment, and I believe the U.S. Postal Inspector feels that way, as well. [Emphasis added.]

In *King*, a criminal investigator with a sheriff's department named Alford reported the facts of his investigation to Sutton, the district attorney. *King*, 126 S.W.3d at 77. After the grand jury indicted the plaintiffs for theft, Sutton spoke with their counsel and he dismissed their charges. *Id.* The trial court directed a verdict in favor of the plaintiffs, based in part on Alford's testimony

36

that knowing that defendant's statements were false could possibly have influenced his investigation. *Id.* at 77, 79. In reversing the trial court's judgment and rendering judgment for the defendant on the basis that the plaintiffs did not establish causation, the supreme court explained that Alford "did not testify that he would have recommended against prosecution or that Sutton would have followed that recommendation." *Id.* at 79.

Similarly, in this case, the postal inspector did not tell Thibodeaux that he would have recommended against prosecution or that the federal prosecuting attorney would have followed that recommendation; the inspector said only that USLD's disclosure of its agreement with Hold "may have" changed his recommendation. Thus, as in *King*, we conclude that the postal inspector's statement is insufficient to provide evidence of causation.

For all of these reasons, we hold that appellants failed to submit more than a scintilla of evidence in response to appellees' no-evidence motion to establish that Thibodeaux and Nowik would not have been prosecuted apart from appellees' involvement in their criminal cases, which is an element of their malicious prosecution claims. *See King*, 126 S.W.3d at 78–79; *Dangerfield*, 264 S.W.3d at 910. Therefore, we overrule their fourth issue, which relates to the trial court's order granting summary judgment for appellees on that claim.

**Appellants' Remaining Issues**

Appellants' first and second issues assert that the trial court erred by striking portions of AAT's summary judgment evidence and by granting appellees' traditional motions for summary judgment. Because we hold that appellees are entitled to judgment on appellants' three remaining claims (fraud, tortious interference with contract, and malicious prosecution) for reasons unrelated to the trial court's evidentiary decision discussed in appellants' first issue and appellees' traditional summary judgment grounds discussed in appellants' second issue, we decline to address those two issues. *See* Tex. R. App. P. 47.1; *Hawkins v. Walker*, 233 S.W.3d 380, 395 n.47 (Tex. App.—Fort Worth 2007, pet. denied); *Luxury Travel Source v. Am. Airlines, Inc.*, 276 S.W.3d 154, 166 n.10 (Tex. App.—Fort Worth 2008, no pet.).

**Conclusion**

Having overruled appellants' third and fourth issues, which are dispositive of their claims on appeal, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: LIVINGSTON, GARDNER, and WALKER, JJ.

DELIVERED: July 9, 2009

38