

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-14-00191-CV**

FIX IT TODAY, LLC AND BANATEX, LLC

APPELLANTS

V.

SANTANDER CONSUMER USA, INC.

APPELLEE

----------

### FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 67-260046-12

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In four issues,[2] appellants Fix It Today, LLC and Banatex, LLC appeal the trial court's judgment for appellee Santander Consumer USA, Inc. (SCUSA).  We reverse and remand.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

As set out in the trial court's findings of fact, appellants engaged in business as FIT Finance to make loans for emergency auto repair that they attempted to secure through an assignment of worker's liens[3] on the repaired vehicles.[4] As the purported assignee of the mechanic's liens, FIT Finance claimed its liens were superior to those of SCUSA, which held perfected purchase money security interests on several vehicles whose owners used FIT Finance's services to pay for vehicle repairs. When SCUSA learned that FIT Finance had repossessed some of the vehicles, it sued appellants for conversion of its secured interest in the vehicles, for tortious interference with contract, for damages under the Texas Theft Liability Act, and for conspiracy, and it sought a

---

[2]Although appellants' brief originally contained five issues, appellants filed a notice of intent to abandon their first issue before the case's submission to this court. Appellants informed the court that they would proceed exclusively on their remaining four issues.

[3]Tex. Prop. Code Ann. § 70.001(a) (West 2014) (stating that "[a] worker in this state who by labor repairs . . . a vehicle," may retain possession of the vehicle until the amount due under the contract for the repairs, or a reasonable and usual compensation if no amount is specified, is paid).

[4]To market its scheme, FIT Finance placed materials in approximately 600 participating repair shops advertising its financial services. During a FIT Finance transaction, customers were advised that they were "putting their vehicle up for collateral." FIT Finance described this process as a debt purchase agreement whereby repair shops acted as agents "to maintain possession of the vehicle" and then to "assign the lien that secured that debt" created by the repair of the vehicle to FIT Finance.

declaratory judgment "to determine the nature, extent[,] and priority of conflicting rights asserted" in the vehicles.

After a bench trial, the trial court entered a final judgment for SCUSA. In its findings of fact, the trial court found that after repossessing the vehicles, FIT Finance sold two of the vehicles (identified as the Lamay and Maiden vehicles); returned five of the vehicles to their owners (identified as the Resendiz, Salas/Hosey, Holden/George, Mitchell, and Monk vehicles); still possessed four of the vehicles (identified as the Anasco, Davidson, Shelton, and Jones vehicles); and attempted to foreclose on liens on several of the vehicles. The trial court concluded as a matter of law that SCUSA was entitled to a declaratory judgment in its favor as to the priority of liens,[5] and that appellants, doing business as FIT Finance, were liable to SCUSA for damages for the conversion of SCUSA's security interests, for tortious interference with SCUSA's contracts involving the vehicles, for theft under the Texas Theft Liability Act with regard to the unlawful appropriation of SCUSA's security interests, and for conspiracy for "not less than the value of the Vehicles or the balance due under the Contracts and Notes in the amount of $86,800."

---

[5]Although appellants abandoned their challenge to the trial court's conclusion that the Texas worker's lien statute does not allow for assignment of the possessory lien, we note that their theory would violate the statute's express language, which permits possessory liens for *workers who make repairs*. *See* Tex. Prop. Code Ann. § 70.001(a)–(e).

3

The trial court awarded to SCUSA a declaratory judgment, $86,800 in damages, $65,000 in attorney's fees for preparation and trial with additional attorney's fees made conditional on appeal, costs, and post-judgment interest. This appeal followed.

### III. Sufficiency of the Evidence

In their second and fifth issues, appellants challenge the sufficiency of the evidence to support the trial court's damages calculations and SCUSA's conspiracy claim.

### A. Legal Sufficiency

The essence of appellants' argument in their fifth issue is that there is no evidence of conspiratorial intent or that Fix It Today was involved in any sort of conspiracy with Banatex. When a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those grounds that would afford the party the greatest relief. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000); *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999). Therefore, we will address appellants' fifth issue first.

#### 1. Standard of Review and Applicable Law

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a

4

mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009).

The essential elements of a civil conspiracy claim are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Bilbrey v. Williams*, No. 02-13-00332-CV, 2015 WL 1120921, at *14 (Tex. App.—Fort Worth Mar. 12, 2015, no pet. h.) (mem. op.) (citing *In re Lipsky*, 411 S.W.3d 530, 549 (Tex. App.—Fort Worth 2013, orig. proceeding), *mand. denied*, No. 13-0928, 2015 WL 1870073 (Tex. Apr. 24, 2015)). A defendant's liability for conspiracy depends on participation in some

5

underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable; merely proving a joint intent to engage in the conduct that resulted in the injury is not sufficient to establish a cause of action for civil conspiracy. *Id.* Instead, civil conspiracy requires the specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Id.* In this case, the underlying torts are conversion and tortious interference. *See Chrysler Credit Corp. v. Malone*, 502 S.W.2d 910, 915 (Tex. Civ. App.—Fort Worth 1973, no writ) (stating that to prevail on a conversion claim on a security interest, a plaintiff has to prove that it owned a valid and perfected security interest in each secured item and that the defendant, who was not a buyer-in-the-ordinary-course-of-business, converted the security interest; the plaintiff also has to show the item's reasonable cash market value at the time and place of the conversion); *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex. App.—Fort Worth 2009, pet. denied) (stating that the elements of a cause of action for tortious interference are the existence of a contract subject to interference, willful and intentional interference that proximately causes damage, and actual damage or loss).

## 2. Evidence

During SCUSA's case, Carl Clements, the owner of CMC Auto Tech, testified that some people came in and asked him if they could leave some brochures for FIT Finance. He stated that his understanding was that "they come in and if someone doesn't have the money to make their repairs, then they call

6

them and they finance [the repairs] for them." FIT Finance called Clements to tell him that Wendell Davidson had been approved for a loan, and Clements authorized Banatex to make electronic fund transfers to him to cover Davidson's repair bill. Clements filled out the vehicle condition report that FIT Finance faxed to him for Davidson's vehicle, and he began the repairs when FIT Finance approved Davidson's application. FIT Finance paid CMC in full for the repairs to Davidson's vehicle.[6] Clements agreed that what he signed with Banatex stated that he was entering into an agreement for Banatex to acquire customer debt from him.

Davidson testified that Clements pointed out FIT Finance's brochure to him and that he applied for a loan despite the 259.2863% annual interest rate listed in the application. Davidson's November 16, 2012 final invoice from Banatex sought $3,081.35—$1,391.89 for "partial of invoice unpaid," plus fees for insufficient funds, processing, and removal. Banatex, listing itself as "Attorney in fact for CMC Auto Tech Inc[.]," issued a notice of foreclosure of worker's lien on April 5, 2012. Russell Pickens, SCUSA's assistant vice president of asset remarketing and designated corporate representative, testified that he called FIT Finance when Davidson brought the repossession of Davidson's vehicle to his attention.

---

[6]The owners of three other automobile repairs shops also testified about being visited by sales representatives from FIT Finance and FIT Finance's paying for repairs.

7

Loai Sarabi testified by deposition that he was the founder of Banatex and Fix It Today but that he was not the sole owner of either company, both of which used the assumed name FIT Finance. Loai said that he and his brother Adam Sarabi owned, managed, controlled, and operated Fix It Today and Banatex.

Loai explained that "Fix It Today partners with auto repair centers in helping them eliminate the debt that's been incurred by . . . consumers fixing their auto repair, fixing their vehicle" by facilitating and helping the shop find a lender that will purchase the debt. Loai said that Fix It Today had been partnering with repair facilities for around three years and that it was currently partnered with over 500 repair facilities. To partner with the repair facilities, Fix It Today presented a "merchant agreement," drafted by a law firm hired by Banatex, that Banatex and the repair center would execute. Loai stated, "Fix It Today doesn't offer a lending solution. It just offers the platform for Banatex to offer a lending solution."

Loai testified that Fix It Today also performed the front-end work to help the customer and repair shop get their documents prepared for debt purchase by Banatex, including handling the underwriting criteria such as pulling motor vehicle records. Banatex paid Fix It Today for front end processing or packaging at $200 to $300 per loan plus an additional monthly stipend for advertising and marketing depending on Banatex's needs as to the number of transactions and how much additional servicing Fix It Today had to do.

Loai stated that, as of the time of his deposition, Fix It Today did not have any contractual relationships with any entity other than Banatex for the advertising or marketing of any product, service, extension of service, loan, or financing arrangement related to the repair of motor vehicles. Fix It Today employed two employees as front-end customer service representatives, and Banatex employed five employees plus Loai. Banatex handled the back-end work, which included collections, serving, repossession, and liquidation of collateral. Loai stated that with regard to the debt associated with the vehicle transactions, Banatex held the debt, not Fix It Today.

Ahmad "Adam" Sarabi, corporate representative for both Fix It Today and Banatex, was the only witness to testify during appellants' case. Adam testified that he was chief operating officer for both Banatex and Fix It Today. He stated that Fix It Today was a marketing and advertising company and that Banatex was a Utah-based debt-purchasing company. Adam further stated that the companies did not operate as a joint enterprise and were not a partnership; rather, Fix It Today advertised Banatex's services for a fee but had no role in extending financing to customers or any right to proceeds from Banatex's financing agreements.[7] Adam said that the repair shops had contractual relationships with Banatex but not Fix It Today. Fix It Today had also been providing advertising and marketing services to "a couple of check guarantee

_____

[7]Appellants' discovery responses included an admission that both Fix It Today and Banatex "do business under the assumed name 'Fit Finance.'"

9

companies" when the transactions at issue occurred but Banatex was its biggest client.

### 3. Analysis

The trial court found that Banatex and Fix It Today operated in concert as FIT Finance and engaged in acts designed to deprive SCUSA of its perfected security interest in the vehicles at issue by "falsely and fraudulently claiming to hold a valid possessory worker's lien that is superior to SCUSA's perfected security interest." The trial court further found that Fix It Today knew, agreed to, and intended this common objective or course of action that resulted in damages to SCUSA. Appellants argue that there is no evidence of conspiratorial intent when the only evidence at trial was that Fix It Today did not operate a joint enterprise with Banatex in extending financing and had no right to any of the proceeds from any financing agreements reached by Banatex.

We have reviewed the record, and there is no evidence to show that Fix It Today was involved in repossessing the vehicles, that Fix It Today performed any unlawful, overt acts in advertising and marketing Banatex's financial scheme, or that Fix It Today acted with the specific intent to agree to accomplish any unlawful purpose or to accomplish a lawful purpose by unlawful means. *See Bilbrey*, 2015 WL 1120921, at *14; *see also All Am. Tel., Inc.,* 291 S.W.3d at 532 ("General claims of interference with a business relationship are insufficient to establish a tortious interference with contract claim."). To the contrary, the record reflects that Fix It Today's intent was to market Banatex's services in repair

10

shops in exchange for payment by Banatex.  Therefore, we sustain appellants'
fifth issue.

## B. Factual Sufficiency

In their second issue, appellants argue that the evidence is insufficient to support the trial court's damages calculation when a fair market value calculation at the time of the conversion requires evidence of the vehicles' location and condition.[8]  *See United Mobile Networks v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997) ("Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion.").

### 1.  Standard of Review

When, as here, the party without the burden of proof on a fact issue complains of an adverse fact finding, that party must show that there is "insufficient evidence" supporting the finding; that is, that the credible evidence supporting the finding is too weak or that the finding is against the great weight and preponderance of the credible evidence contrary to the finding.  *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); W. Wendell Hall, *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 3, 41–42 (2010).

---

[8]Appellants further complain that Pickens, SCUSA's damages expert and corporate representative, did not "have any knowledge of the condition, location[,] or suitability of the actual Vehicles at issue."

11

## 2. Fair Market Value Calculation

To prevail on its conversion claim, in addition to the other elements of conversion, SCUSA had to show the reasonable cash market value of the car at the time and place of the conversion. *See United Mobile Networks*, 939 S.W.2d at 147–48; *Chrysler*, 502 S.W.2d at 915. The market value of property is determined at the location where the damage occurred. *Am. Hat Co. v. Wise Elec. Coop.*, No. 02-09-00368-CV, 2010 WL 4028098, at *7 (Tex. App.—Fort Worth Oct. 14, 2010, pet. denied) (mem. op.). The mere taking and recording of a security interest upon personal property, even though from someone who is not the true owner, does not constitute conversion when the party taking the security interest never exercises ownership or control other than the filing of the security interest. *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982). Therefore, no conversion occurred until appellants repossessed the vehicles.[9] *See id.*

## 3. Analysis

Pickens testified that he had previously been SCUSA's assistant vice president over impounds and product cancellation in addition to "numerous manager positions in the collection environment" over his six and a half years

---

[9]At the conclusion of trial, SCUSA's counsel informed the trial court that SCUSA was only asking for damages "as to each vehicle that was repossessed by FIT Finance and either still in their possession, which means not sold, or sold, there's six of these, . . . we are asking for damages in the lesser of the payoff or the NADA value." Counsel further clarified that SCUSA was not seeking damages for vehicles that SCUSA had repossessed and sold but rather for the remaining vehicles in appellants' possession and for a declaration that appellants have and had no lien.

12

with SCUSA. He stated that his current responsibilities were to oversee SCUSA's internal operations with regard to vehicle repossession and to move the vehicles to auction, including pricing them before auction sale. Pickens also stated that when he was assistant vice president over impounds, his job was to oversee notices that came in from impound facilities for mechanic's liens.

Plaintiff's Exhibit 86, a summary of Pickens's testimony, was admitted into evidence with appellants' caveat that they did not admit to the accuracy of any of the numbers.[10] Pickens stated that automotive guidebook pricing from the National Auto Dealers Association (NADA) was customarily used "in the industry" to place values on vehicles and supplied the value testimony as of June 2012; NADA excerpts were separately entered into the record in Plaintiff's Exhibits 46 through 60. Pickens testified that SCUSA's legal department had selected June 2012 as the date to report the NADA values but said, "I can't answer that," when asked whether the date somehow related to the contracts between SCUSA's customers and Banatex. Pickens agreed that he could not personally testify as to the factors that went into reaching the June 2012 NADA value determinations, including whether they accounted for vehicle condition or mileage, and he stated that he had not inspected any of the vehicles and that the value estimates did not

---

[10]The trial court also admitted Defendant's Exhibit 50, a vehicle report summary, with the same caveat by SCUSA about not admitting to the accuracy of any of the numbers.

13

account for the repairs financed by appellants.[11]  Additional evidence for some of the vehicles included FIT Finance's "wholesale value" of the vehicle at the time of the repairs[12] and SCUSA's payoff amounts as of December 2013 or January 2014.[13]

The record reflects that, as found by the trial court, FIT Finance repossessed and sold the Lamay and Maiden vehicles and repossessed and retained the Davidson, Anasco, Shelton, and Jones vehicles.  Having reviewed the record, we conclude that the evidence is factually insufficient to support the dollar amount of the trial court's $86,800 damages judgment because, as set out below, none of the evidence shows the reasonable cash market value of the car *at the time and place of the conversion*.  *See United Mobile Networks*, 939 S.W.2d at 147–48; *Chrysler*, 502 S.W.2d at 915.

The Lamay vehicle was repossessed on February 1, 2012—several months before the June 2012 NADA valuation of $18,750, which the trial court

---

[11]There is no testimony in the record to explain whether repairs should factor into valuation.

[12]When asked in discovery about the fair market value of the vehicles when repossessed by Banatex, appellants responded that they were unaware of the vehicles' fair market values but referred SCUSA to "the underwriting file for [each] vehicle which states a projected value at the time of its repairs."

[13]Although Pickens testified that the payoff information had been pulled two days before his testimony at the end of January 2014, the payoff letters were all dated December 2013.

14

relied upon in making its $18,750 value finding.[14]  Likewise, the Anasco vehicle was repossessed on March 16, 2012—around a month after the Lamay vehicle but still a few months before the June 2012 NADA valuation of $18,025, which the trial court relied upon in making its $18,025 value finding.[15]  The Maiden vehicle was repossessed on September 13, 2011, almost a year before the NADA June 2012 valuation of $16,225 relied upon by the trial court.[16]  And while the trial court found that the Shelton vehicle's fair market value was $11,375, based on the June 2012 NADA valuation of $11,375, Bertha Shelton testified in her deposition that the vehicle was worth $9,000 or $10,000 when it was repossessed on December 4, 2012, six months after the NADA valuation date.[17]

The trial court found that the Jones vehicle's fair market value was $14,400, based on the June 2012 NADA valuation of $14,400.  However, while

[14]The record also contains FIT Finance's "wholesale value" determination at the time of the August 2011 repairs, $13,875, and the auction sales price, $5,400.  The vehicle had 53,433 in mileage when purchased in 2010 and had approximately 71,739 in mileage in August 2011.

[15]The record also contains FIT Finance's "wholesale value" of $14,000, determined at the time of the October 2011 repairs.  The vehicle had 43,758 in mileage when purchased in 2009 and had approximately 88,081 in mileage in October 2011.

[16]The record also contains FIT Finance's "wholesale value" of $11,650, determined at the time of the June 2011 repairs.  In their discovery responses, appellants stated that Banatex sold the vehicle for $4,460.

[17]The record reflects that Shelton acquired the vehicle in 2009, when it had mileage of 33,421.  The repair shop indicated that Shelton's vehicle was in "very good" condition, with 108,231 in mileage on December 7, 2011.  FIT Finance's "wholesale value" estimate for the vehicle in December 2011 was $4,450.

15

the notice of foreclosure of worker's lien was issued June 26, 2012, nothing in the record indicates when the vehicle was actually repossessed.[18]

The Davidson vehicle's value finding is the only value finding directly supported by some evidence in the record. Davidson testified that at the time of the repossession, the vehicle was worth $8,000 or $9,000, and the trial court found that it was worth $8,025 based on the 2012 NADA valuation of $8,025.[19] Although this amount is supported by some evidence in the record, $8,025 exceeds the amount necessary to pay off the SCUSA lien, which the record reflects was $7,535.54. *See Chrysler Credit Corp.*, 502 S.W.2d at 915 (stating that the case was tried on the theory that if the reasonable cash market value of the vehicle at issue equaled or exceeded the amount of the plaintiff's security interest in it, then the plaintiff was entitled to recover on the theory that its

---

[18]Jones acquired the used vehicle in 2008. In January 2012, when Jones entered the agreement with FIT Finance, the vehicle had mileage of 72,481. Unlike the other vehicles at issue, the record does not contain a "wholesale value" estimate by FIT Finance at the time of the repairs.

[19]Additional evidence showed that FIT Finance's "wholesale value" in November 2011 was $5,675. Davidson acquired the used vehicle in 2006 with 13,596 in mileage, and he entered the repair agreement on November 18, 2011. Appellants' documents indicate that the Black Book value for a 2005 Chrysler Town & Country LX Wagon with mileage of 93,000 as of November 7, 2011 was between $5,725 and $9,950 for retail and between $4,100 and $7,225 for wholesale.

Davidson was unclear as to when the vehicle was repossessed—he said he thought it occurred around January or February 2013. Banatex issued the notice of foreclosure on worker's lien on April 5, 2012. The invoice by the recovery company was dated April 26, 2012.

16

security interest had been converted *and its measure of recovery would be the amount of the security interest*; if the vehicle's value did not equal or exceed the amount of the plaintiff's security interest, then its recovery would be limited to and could not exceed the reasonable cash market value of the car at the time and place of the conversion).

Based on the foregoing, we sustain appellants' second issue with regard to the factual sufficiency of the evidence to support the trial court's damages award and do not reach appellants' third issue, which also challenges the trial court's damages award. *See* Tex. R. App. P. 47.1.

## IV. Attorney's Fees

In their fourth issue,[20] appellants complain that the trial court erred by awarding to SCUSA 100% of its attorney's fees when those fees were not available for three of its five prevailing claims and SCUSA failed to segregate any of its time for those three claims. SCUSA points out that it was entitled to attorney's fees under the declaratory judgments act, the Theft Liability Act, and under property code section 70.008 and contends that no segregation was required because the underlying facts were the same for all of its claims.

---

[20]We reach this issue because appellants abandoned their first issue, challenging the trial court's declaratory judgment and because we must reverse and remand the case for a new trial on attorney's fees when we cannot tell whether an erroneous damages award affected the trial court's determination of attorney's fees. *See Young v. Qualls*, 223 S.W.3d 312, 313 (Tex. 2007).

17

Texas law prohibits recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors, LP v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). If any attorney's fees relate solely to claims for which fees are not recoverable, a claimant must segregate recoverable from unrecoverable fees. *Id.* at 313. "Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14. We must examine the facts alleged in support of the claims to determine whether they are inextricably intertwined, and if the prosecution or defense does not entail proof or denial of essentially the same facts, the exception does not apply. *In re W.M.R.*, No. 02-11-00283-CV, 2012 WL 5356275, at \*15 (Tex. App.—Fort Worth Nov. 1, 2012, no pet.) (mem. op.).

In its first of six petitions, filed January 29, 2012, SCUSA brought causes of action for declaratory judgment, conversion, and tortious interference with contract, alleging that it owned notes secured by security interests in motor vehicles and that FIT Finance had "engaged in acts designed to deprive [SCUSA] of its perfected security interest[s] . . . by falsely and fraudulently claiming to hold a valid possessory worker's lien that is superior to [SCUSA's] perfected security interest." It sought a declaration of the nature, extent, and priority of conflicting rights asserted in the motor vehicles at issue, in addition to damages for conversion based on repossession and for tortious interference with contract based on interference with SCUSA's contracts and notes on the

18

vehicles. SCUSA did not add conspiracy as a cause of action until its third amended petition, filed on February 13, 2013. It added the Texas Theft Liability Act, based on the repossessions as the wrongful appropriation of property, to its fourth amended petition, filed on March 4, 2013.

In his affidavit in support of attorney's fees, SCUSA's counsel stated,

Although attorneys' fees are not generally recoverable in conversion claims, *the legal services rendered to SCUSA in the prosecution of its claims under the Texas Uniform Declaratory Judgments Act, the Texas Theft Liability Act[,] and Chapter 70 of the Texas Property Code are indistinguishable from prosecution of the conversion claims* in that all claims relate to the enforcement of SCUSA's perfected purchase money security interest in the motor vehicles subject of the Defendants' alleged statutory possessory worker's liens, and recovery of damages resulting from the assertion of those liens. In my opinion, the legal services are so intertwined that they need not be segregated. [Emphasis added.]

Counsel did not address SCUSA's claims for conspiracy or tortious interference but attached twenty-one pages of fee records, beginning with June 20, 2012, around a month before SCUSA filed its first amended original petition on July 16, 2012.

We have reviewed the elements of conversion, tortious interference, and conspiracy as set out above. Because some of the elements of these tort claims, for which attorney's fees are not recoverable, differ from the declarations sought and because of the additional work involved in researching and adding the conspiracy claim, SCUSA could have and should have segregated its attorney's fees. Therefore, we sustain appellants' fourth issue. *See Farmers Grp. Ins., Inc. v. Poteet*, 434 S.W.3d 316, 333 (Tex. App.—Fort Worth 2014, pet. denied)

19

(stating that unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be on remand).

## V. Conclusion

Because appellants abandoned their first issue, we affirm the declaratory portion of the trial court's judgment,[21] but having sustained appellants' fifth issue, we reverse the portion of the trial court's judgment that pertains to SCUSA's conspiracy claim and render a take-nothing judgment on that claim. *See* Tex. R. App. P. 44.1(b) (stating, in pertinent part, that if the error affects part, but not all, of the matter in controversy, and that part is separable without unfairness to the parties, the judgment must be reversed and a new trial ordered only as to the part affected by the error); *cf. Downing v. Burns*, 348 S.W.3d 415, 428–29 (Tex. App.—Houston [14th Dist.] 2011, no pet.).[22] And having sustained appellants'

---

[21]Specifically, the trial court declared that SCUSA held a perfected, first-priority purchase money security interest that was valid, enforceable, and superior to appellants' interest in fifteen vehicles identified by year, name, and vehicle identification number; that the statutory, possessory worker's lien under the property code cannot be assigned to a third party; that appellants' vehicle repossessions were in violation of Texas law and were void ab initio; and that appellants had no valid and enforceable interest in the vehicles.

[22]In *Downing,* our sister court reversed the trial court's judgment and remanded all of the claims to the trial court when the tortious-interference, defamation, and theft claims were so interwoven that they were not separable without unfairness. 348 S.W.3d at 429 ("In sum, evidence of defamation was used to support Downing's tortious-interference claim and rebut the Burnses' affirmative defenses; evidence of theft was used to support the Burnses' affirmative defense to the tortious-interference claim."). In contrast, here, while SCUSA presented evidence pertaining to appellants' liability for conversion, theft, and tortious interference, no evidence in the record supported SCUSA's conspiracy claim.

second issue on the trial court's damages award and their fourth issue with regard to segregation of attorney's fees, we reverse the trial court's judgment as to SCUSA's conversion, tortious interference, and Texas Theft Liability Act claims and the attorney's fee award and remand these claims for a new trial. *See Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401–02 (Tex. 1981).

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  DAUPHINOT, GABRIEL, and SUDDERTH, JJ.

DELIVERED:  May 7, 2015