**Opinion filed August 20, 2020**



In The

# Eleventh Court of Appeals

_____

## No. 11-17-00265-CV

_____

**JATEX OIL AND GAS EXPLORATION L.P., JOHN A. TRUITT, INC., AND JOHN A. TRUITT, Appellants**

**V.**

**NADEL AND GUSSMAN PERMIAN, L.L.C. AND SCOTT GERMANN, Appellees**

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause No. CV51210**

## O P I N I O N

This appeal arises from a dispute between a working interest owner and the operator of an oil and gas development known as the Clyde Prospect, which is in Glasscock County. Appellant Jatex Oil and Gas Exploration L.P. is the aggrieved working interest owner. Jatex, joined by its general partner, John A. Truitt, Inc. (Truitt, Inc.), and the principal of both entities, John A. Truitt (Truitt), filed suit

against Appellees, Nadel and Gussman Permian, L.L.C. (NGP) and NGP's general manager, Scott Germann. Appellants asserted causes of action for breach of contract, failure to act as a reasonably prudent operator, and tortious interference with a contract. The trial court granted summary judgment in favor of Appellees on all of Appellants' claims. Appellants bring two issues on appeal. We affirm.

*Background Facts*

Truitt is a petroleum geologist. He alleged that, in 2008, he acquired three leases covering approximately 8,000 acres in Glasscock County known as the Clyde Prospect. He further alleged that he sold the prospect to NGP, retaining a 6.25% working interest in favor of Jatex. In 2010, Jatex and the other working interest owners executed a joint operating agreement that named NGP as the operator of the prospect area. Appellants premise their causes of action for breach of contract and failure to act as a reasonably prudent operator on NGP's alleged breach of the joint operating agreement.

On October 27, 2011, Jatex executed a promissory note to Security Bank for a "reducing revolving line of credit" in the maximum amount of $3,000,000. Jatex pledged as collateral to the bank its mineral interests in the Clyde Prospect as well as other mineral interests owned by Appellants. The 2011 note required monthly payments due on the 28th of each month with a final maturity date of October 28, 2015. Truitt, Inc. and Truitt were guarantors of the note.

Appellants were in default on the 2011 note for several months. Security Bank's attorney sent the first default notice on August 26, 2013. In the initial notice, Security Bank demanded a payment of $497,470.70 by September 26, 2013. Security Bank sent subsequent default notices on the 2011 note as follows:

| Date of Default Notice | Payoff Balance | Proposed Foreclosure Date |
|---|---|---|
| October 23, 2013 | $2,333,411.91 | (none) |

2

| December 13, 2013 | $2,335,346.31 | January 7, 2014 |
| February 10, 2014 | $2,356,440.86 | March 4, 2014 |
| March 11, 2014 | $2,074,120.24 | April 1, 2014 |
| May 12, 2014 | $2,012,889.04 | June 3, 2014 |

Appellants executed a new note on May 27, 2014, in the amount of $1,996,826.94. Appellants attached a copy of it to their petition. It was a "term promissory note" that provided for five monthly installments of "one hundred percent (100%) of [Appellants'] Oil and Gas Proceeds [as defined in the note]" beginning on June 27, 2014, and continuing until November 27, 2014, when the remaining unpaid balance "on this Note shall be due and payable."

Security Bank sent its final (seventh) notice of default on December 10, 2014. The bank asserted in this notice that the 2014 note "became fully due on November 27, 2014," and that Jatex owed the bank $1,928,617.63 under the note. The final notice listed a proposed foreclosure date of January 6, 2015. Security Bank foreclosed upon Appellants' mineral interests on January 6, 2015, by purchasing the pledged mineral interests for $1,500,000.

The principal event giving rise to Appellants' claims was NGP's proposal in May 2014 to deepen the Vaqueros 47 No. 1 Well. Appellants asserted that, under the joint operating agreement, a written consent election was required to include a nonoperator in a proposed drilling operation. Appellants contend that NGP improperly included Jatex in the project and erroneously assessed charges to Jatex's account because Jatex did not make a written election to participate in the project. Appellants asserted that this action of improperly billing Jatex's account constituted a breach of the terms of the joint operating agreement. Appellants contend that NGP's improper billing caused Security Bank to foreclose on the mineral interests owned by Appellants that had been pledged as collateral by Appellants. Appellants

3

also asserted that the alleged improper billing by NGP constituted tortious interference with contracts that Appellants had with the bank.

Appellees filed a combined no-evidence and traditional motion for summary judgment. Appellants filed a response to the summary judgment motion that included an unsworn declaration executed by Truitt. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 132.001 (West 2019). Truitt's declaration included an exhibit wherein he expressed an estimate of the fair market value of the mineral interests foreclosed upon by the bank. Appellees filed a motion to exclude Truitt's economic evaluation of the fair market value. The trial court granted the motion to exclude Truitt's economic evaluation. This evidentiary ruling is the basis of Appellants' first issue. The trial court also granted Appellees' motion for summary judgment. In their second issue, Appellants challenge the summary judgment.

*Analysis*

We review the trial court's grant of summary judgment de novo. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). However, a trial court's decision to exclude or admit summary judgment evidence is reviewed for an abuse of discretion. *Id.* (citing *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017)). Accordingly, Appellants' first issue requires us to determine if the trial court abused its discretion when it struck Truitt's valuation testimony. *See id.*; *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016) (A trial court's evidentiary rulings are reviewed for abuse of discretion.). An abuse of discretion exists only when the trial court's decision is made without reference to any guiding rules and principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). "An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

4

*Motion to Strike Truitt's Valuation of Mineral Interests*

In their initial designation of experts, Appellants designated Truitt as an expert. The designation provided that Truitt "may testify as to the value of the [working interests] and [overriding royalty interests] held under the Deed of Trust which was lost to Security Bank." Appellants subsequently filed an amended designation of experts that omitted Truitt as an expert. Appellants filed this amended designation approximately one year prior to Truitt's deposition.

One month after Truitt's deposition, Appellants filed their response to Appellees' motion for summary judgment. Appellants' response included Truitt's declaration wherein he gave an estimate of the fair market value of the mineral interests that were foreclosed upon by the bank. Truitt stated his evaluation as follows:

> I am a degreed Petroleum geologist with numerous petroleum engineering courses and classes. Began my oil and gas career with Marathon Oil Company in 1983. Formed JATEX Oil & Gas Exploration, LP in 1983. I have over thirty-four years generating, evaluating and selling prospects and projects in the Permian Basin. My experience in the areas under the bank agreements is extensive. Most of the properties lost were discoveries made productive by my local expertise.

> Fair Market value is the price a willing buyer will pay and a willing seller will accept for a property, when the property is exposed to the market for a reasonable period of time, and neither party has any compulsion to buy or sell, and both being knowledgeable of the pertinent facts. The property was purchased by the bank from the bank within days of foreclosure to eliminate exposure to a competitive market. The collusion price was well below the banks own PDP value for the properties.

> The value generated in Mr. Patterson's[1] report is by his own admission . . . incomplete, addressed just a few of the wells for PDP

---

[1]Dee Patterson was a retained expert designated by Appellees.

value only and is therefore unreliable at best. Mr. Lee[2] attempted to include most of the properties and wells. In my opinion Mr. Lee's report was generated for a third party and represent[s] a more accurate presentation between the two. Both reports fall short of a full economic evaluation of the properties. The Society of Petroleum Evaluation Engineers (SPEE) in their publication Elements of a Reserve and Resource [R]eport state that a proper report should include values for PDP, PDNP, PDBP, PUD and Probable. Neither report included any value for behind pipe potential (PDNP), proven undeveloped locations (PUD) or probable locations.

Cawley, Gillespie & Associates, Inc. is an engineering evaluation firm well respected in the oil and gas industry. The NYMEX STRIP price that they were using December 1, 2014 represents a fair assumption and was nearest the time of foreclosure. The numbers are similar to those used by Mr. Lee to establish his PDP value and below Nadel's September 2014 actual sales dollars. The properties under the bank agreement represented over 18,000 gross acres with stacked pay zones for both oil and gas. They would be classified as PUD and probable locations. Prices for acreage in the Permian for similar acreage with sta[c]ked pays have averaged $15,000-$20,00 [sic] per acre. A conservative $ 5,000 per net acre was used in this report. The acreage also included a large PDNP component. The attached stratigraphic chart shows the stack by potential in the Glasscock property allow. The current production is Lower Wolfcamp and deeper. The zones above the Lower Wolfcamp in this example are considered PDNP in most wellbores. Based on my thirty plus years evaluating, generating and selling properties in these areas I believe the true value of the properties is closer to $12,000,000.

|              | PV(9%)             |
|--------------|--------------------|
| PDP          | 2,975              |
| PUD & Prob.  | 6,986              |
| PDNP         | 2,356              |
|              | $12,317 Grand Total |

---

[2]Robert Lee performed appraisals for the bank. Appellants and Appellees designated Lee as a non-retained expert.

6

Truitt's valuation was followed by two charts. The first chart listed estimates for future sales prices for oil and gas. The second chart listed various oil and gas formations that appear to be associated with the Clyde Prospect. Truitt classified the formations less than 7,500 feet in depth as "PDNP Behind Pipe" and the deeper formations as "PDP Producing in existing Wells."

Appellees filed a motion to exclude Truitt's economic evaluation of the fair market value of the interests that the bank foreclosed upon. Appellees asserted the following three grounds for excluding Truitt's valuation: (1) Truitt was not qualified to offer expert opinions on valuation; (2) his opinions on valuation were not reliable; and (3) his opinions were not timely disclosed. With respect to the third ground, Appellees asserted that Truitt gave his valuation one year after Appellants' deadline for designating experts. Appellees also asserted that, in his deposition taken one month earlier, Truitt was asked: "[D]o you have an evaluation or an analysis of the value of your interest as of January 6[,] 2015,[3] that you prepared?" Truitt replied, "No."

In the trial court, Appellants responded to Appellees' objections to Truitt's valuation by asserting that his opinions on value were admissible under the Property Owner Rule. *See Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155–59 (Tex. 2012); *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852–53 (Tex. 2011); *Tuttle v. Builes*, 572 S.W.3d 344, 356–57 (Tex. App.—Eastland 2019, no pet.). On appeal, Appellants contend that the trial court abused its discretion by striking Truitt's valuation because it was proper under the Property Owner Rule.

Under the Property Owner Rule, a property owner is generally qualified to testify to the value of his property even if he is not an expert and would not be

[3]As noted previously, January 6, 2015, was the date of foreclosure.

7

qualified to testify to the value of other property. *Reid Rd. Mun. Util. Dist. No. 2*, 337 S.W.3d at 852–53 (citing *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984)). The rule is based on the presumption that an owner will be familiar with his own property and know its value. *Id.* at 853. Organizations are the same as natural persons for purposes of the Property Owner Rule. *Id.* The entity can prove the value of its property through certain officers or employees whose management positions warrant applying a presumption that they are familiar with the entity's property and its value. *Id.* at 854.

"The Property Owner Rule falls under Texas Rule of Evidence 701, which allows a lay witness to provide opinion testimony[.]" *Justiss*, 397 S.W.3d at 157. It provides an exception to the requirement that a witness must establish his qualifications to express an opinion on land values. *Id.* Under the rule, a property owner's testimony fulfills the same role that expert testimony does. *Id.* With the exception of establishing his qualifications to testify as to property value, the property owner's valuation testimony must still meet "the same requirements as any other opinion evidence." *Id.* at 155 (quoting *Porras*, 675 S.W.2d at 504). "Because property owner testimony is the functional equivalent of expert testimony, it must be judged by the same standards." *Id.* at 159. Thus, conclusory testimony from a property owner about the value of his property without an explanation will not support a judgment. *Justiss*, 397 S.W.3d at 158–59, 161; *Tuttle*, 572 S.W.3d at 358. An expert's opinion is conclusory when it is without a reliable predicate. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006); *Burrow v. Arce*, 997 S.W.2d 229, 236 (Tex. 1999).

In *Arkoma Basin Exploration Co. v. FMF Associates 1990-A, Ltd.*, the Texas Supreme Court noted that "the value of mineral reserves is not a matter of common knowledge." 249 S.W.3d 380, 388 (Tex. 2008) (citing TEX. R. EVID. 702; *Kerr–McGee Corp. v. Helton*, 133 S.W.3d 245, 254 (Tex. 2004); *Gulf States Utils. Co. v.*

*Low*, 79 S.W.3d 561, 567 (Tex. 2002)). Accordingly, a party seeking a recovery based upon the value of mineral reserves must prove those damages by expert testimony. *See Cty. Mgmt., Inc. v. Butler*, 650 S.W.2d 888, 890 (Tex. App.—Austin 1983, writ dism'd by agr.), *abrogated on other grounds by Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1 (Tex. 2008). As noted in *Butler*, an estimate of mineral reserves is a highly technical endeavor that requires an examination of such matters as drilling logs, production costs, and geological trends. *Id.*

We held in *Wortham Bros., Inc. v. Haffner* that the presumption afforded by the Property Owner Rule that a property owner is qualified to testify about the value of his property does not extend to matters that are of a technical or specialized nature. 347 S.W.3d 356, 361 (Tex. App.—Eastland 2011, no pet.). That principle applies in this case—an owner of a mineral interest is not qualified under the Property Owner Rule to give lay opinion evidence under Rule 701 on the value of mineral reserves because of the technical, specialized nature of that valuation. Thus, a valuation of mineral reserves constitutes expert opinion evidence under Rule 702 because it "is based on special knowledge, skill, experience, training, or education in a particular subject." *See Reid Rd. Mun. Util. Dist. No. 2*, 337 S.W.3d at 850.

A review of Truitt's declaration pertaining to his valuation of the mineral interests that the bank foreclosed upon reveals the technical nature of his opinion on valuation. He begins the report by giving his education and experience and noting his "local expertise," which indicates that he was giving expert opinion evidence under Rule 702. *See id.* at 852. He also criticized the valuations performed by Appellees' expert and the bank's expert. With respect to his valuation of the mineral interests, Truitt cites a publication from the Society of Petroleum Evaluation Engineers for a variety of technical acronyms that must be included in a valuation

of mineral reserves. He calculated his valuation by assigning values to the matters related to these acronyms to compute a valuation in excess of $12 million.

Because Truitt's valuation of the mineral interests was of a technical nature and constituted expert opinion testimony under Rule 702, it should have been disclosed in discovery. *Id.* at 851–52 (noting that "there is no good reason" to allow surprise expert testimony). The circumstances of this case are particularly compelling to support a finding of discovery circumvention when one considers that Appellants previously designated Truitt as an expert on valuation and then "undesignated" him. *See id.* On top of that, Truitt testified in his deposition, taken only one month earlier, that he had not performed a valuation of the mineral interests.

Additionally, even if one assumes that Truitt's valuation testimony was admissible as Rule 701 lay opinion testimony under the Property Owner Rule and did not have to be disclosed in discovery, it still had to meet the requirements for expert opinion testimony. *Justiss*, 397 S.W.3d at 155–59. "Bare conclusions" without explanation will not support an opinion on the value of property. *Id.* at 156 (citing *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 231–32 (Tex. 2004)). A property owner "must provide the factual basis on which his opinion rests." *Id.* at 159. Furthermore, an expert must provide a sufficient description of the analysis that he used so that the court can determine if his conclusions are reliable. *Helton*, 133 S.W.3d at 257–58. As noted in *Helton*, an expert's opinion is not reliable if there is "too great an analytical gap between the data and the opinion." *Id.* at 258 (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998)).

As was the case in *Helton*, there is too great of an analytical gap in Truitt's valuation in order for a court to determine if it is reliable. While there is a reference to the calculation that he performed, Truitt provided scant data supporting those calculations. Other than the two charts that we previously referenced, Truitt did not

10

provide any other data in support of his valuation. His opinion on valuation is set out on two pages of the clerk's record, which we have essentially quoted verbatim (other than the two charts that are on those two pages). Truitt's valuation is devoid of supporting data. Thus, even if the data and factors used by Truitt are of the type generally relied upon by petroleum engineers to estimate production or mineral reserves, there is too great of an analytical gap in his valuation for his conclusions to be assessed for their reliability. *See id.* Accordingly, we conclude that Truitt's valuation was conclusory because it lacked sufficient explanation and supporting data.

In summary, the trial court had multiple bases for striking Truitt's valuation of the mineral interests. Accordingly, the trial court did not abuse its discretion by granting Appellees' motion to strike Truitt's valuation from the summary judgment evidence. We overrule Appellants' first issue.

*Summary Judgment*

In their second issue, Appellants assert that the trial court erred in granting summary judgment in favor of Appellees. Appellees filed a combined traditional and no-evidence motion for summary judgment. The trial court granted the motion on unspecified grounds. When the trial court's order fails to specify the grounds for its summary judgment, we will affirm if any of the theories are meritorious. *Knott*, 128 S.W.3d at 216. If a party moves for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

After an adequate time for discovery, a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). We review a no-evidence motion for summary judgment under the same legal sufficiency standard as a directed verdict.

11

*Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Under this standard, the nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims. *Id.* Evidence is no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

A party moving for traditional summary judgment bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). To be entitled to a traditional summary judgment, a defendant must conclusively negate at least one essential element of the cause of action being asserted or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). In reviewing both traditional and no-evidence summary judgments, we consider the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant, and resolving any doubts against the movant. *Merriman*, 407 S.W.3d at 248; *City of Keller*, 168 S.W.3d at 824.

*Breach of Contract/Failure to Act as a Reasonably Prudent Operator*

Appellants' claim for breach of contract is premised on the joint operating agreement. Appellees assert that Appellants' claim against NGP for failing to act as a reasonably prudent operator is essentially a claim for a breach of the joint operating

12

agreement. Appellees cite *Cone v. Fagadau Energy Corp.* in support of this proposition. 68 S.W.3d 147, 160–61 (Tex. App.—Eastland 2001, pet. denied). We held in *Cone* that a claim based on the failure to perform under the terms of an operating agreement is a claim sounding in contract rather than tort. *Id.*; *see also Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 752–53 (Tex. App.— El Paso 2000, no pet.). We agree with Appellees that Appellants' claim that NGP failed to act as a reasonably prudent operator is a claim for a breach of the terms of the joint operating agreement. We further note that Appellants have not asserted otherwise. In this regard, Appellants' brief does not contain any contentions in support of their claim that NGP failed to act as a reasonably prudent operator.

*Standing*

Appellees asserted that there was no evidence that either Truitt, Inc. or Truitt are parties to the joint operating agreement. Appellees also asserted a traditional summary judgment ground that Truitt, Inc. and Truitt cannot maintain a breach of contract action because they are not parties to the joint operating agreement.

A party must have both standing to sue and capacity to sue. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). Appellees couched their argument concerning Truitt, Inc. and Truitt as an issue of standing. However, Appellees' lack-of-privity contention is actually a challenge to capacity, not standing. *See John C. Flood of DC, Inc. v. SuperMedia, L.L.C.*, 408 S.W.3d 645, 651 (Tex. App.—Dallas 2013, pet. denied). Thus, whether a party is entitled to sue on a contract is not truly a standing issue concerning the jurisdiction of the court but, rather, is a decision on the merits. *Transcon. Realty Inv'rs, Inc. v. Wicks*, 442 S.W.3d 676, 679 (Tex. App.—Dallas 2014, pet. denied). Irrespective of this distinction, Appellants have not asserted that Truitt, Inc. and Truitt are parties entitled to enforce the joint operating agreement through a breach of contract action. Accordingly, the

13

trial court did not err by implicitly determining that Truitt, Inc. and Truitt could not sue for breach of the joint operating agreement.

Appellees also assert that Jatex lacks standing to assert a cause of action for breach of the joint operating agreement. As we noted in *Bans Properties, L.L.C. v. Housing Authority of Odessa*, a party to a contract generally has standing to maintain a suit on the contract. 327 S.W.3d 310, 314 (Tex. App.—Eastland 2010, no pet.) (citing *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 618 (Tex. 2004)). Accordingly, we disagree with Appellees' contention that Jatex lacks standing to pursue a claim for breach of the joint operation agreement.

*Damages for Breach of Contract*

Jatex seeks three forms of damages under its claim for breach of contract. These damages are as follows: (1) net revenues withheld from Jatex's account for its proportionate share of the deepening costs for the Vaqueros 47 No. 1 Well; (2) revenues for a 1% interest that was the subject of an agreement between Jatex and the Robert & Maxine Hannifin Trust; and (3) damages that Appellants characterize as "foreclosure damages."

*Deepening Costs for the Vaqueros 47 No. 1 Well*

Appellants asserted in their summary judgment response that the "Crux of the Case" is the following question: "[D]id NGP wrongfully debit drilling expenses from Plaintiff Jatex's account for operations [at the Vaqueros 47 No. 1 Well] . . . ?" Thus, Jatex seeks to recover its proportionate share of the deepening costs for the Vaqueros 47 No. 1 Well that was charged against its account by NGP.[4] Appellants

---

[4]There is a dispute between the parties over the amount of Jatex's proportionate share of the deepening costs for the Vaqueros 47 No. 1 Well that were billed to Jatex's account by NGP. Appellees assert that the amount was $112,076.76, while Appellants assert that the amount was $118,700. Because of our disposition of this appeal, we do not need to resolve this dispute.

also assert that the withholding of these deepening costs caused Security Bank to foreclose upon Appellants' mineral interests.

Appellees assert that Jatex lacks standing to seek the recovery of Jatex's proportionate share of the deepening costs for the Vaqueros 47 No. 1 Well. Appellees base this contention on Jatex's assignment of its net oil and gas revenues from the Clyde Prospect to Security Bank.

The deed of trust and security agreement that Appellants executed with the bank in 2010 contained an "Assignment of Production" that assigned all proceeds from hydrocarbons produced from the mortgaged properties. Security Bank's attorney subsequently notified NGP of its lien on Appellants' interests in the Clyde Prospect in a letter dated November 21, 2013. This letter also notified NGP of the assignment of the proceeds contained in the deed of trust. In the letter, Security Bank requested that NGP begin paying all net revenues attributable to Appellants' interests directly to the bank.

Appellants' assignment of their net revenues from the Clyde Prospect was in the nature of a "collateral assignment" because the assignment constituted a pledge of property to secure repayment of the loan. *See Marhaba Partners Ltd. P'ship v. Kindron Holdings, LLC*, 457 S.W.3d 208, 219 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). Under contract law, a party that assigns its interest under a contract has standing to sue for its damages that it incurred based on the rights that it had prior to the assignment unless its rights were terminated or otherwise released. *Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 430 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Appellants' assignment of their net revenues from the Clyde Prospect did not terminate or release Appellants' rights under the joint operating agreement. Accordingly, we disagree with Appellees' contention that Jatex lacks standing to sue for a breach of the joint operating

15

agreement by virtue of the assignment of its net revenues as collateral to the bank. *See id.* at 431.

Appellees also assert that Appellants do not have a claim for the withheld revenues because Jatex assigned the net revenues to Security Bank and NGP later paid the withheld revenues to the bank. We agree. "Generally, 'after a debtor receives notice of a valid assignment, payment made by the debtor to the assignor or to any person other than the assignee is made at the debtor's peril and does not discharge the debtor from liability to the assignee.'" *Holloway-Houston, Inc. v. Gulf Coast Bank & Tr. Co.*, 224 S.W.3d 353, 361 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quoting *Buffalo Pipeline Co. v. Bell*, 694 S.W.2d 592, 596 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.)). When notice of assignment has been given, "the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor." TEX. BUS. & COM. CODE ANN. § 9.406(a) (West Supp. 2019). As explained by the official comment to Section 9.406: "The revision makes clear that once the account debtor receives the notification, the account debtor cannot discharge its obligation by paying the assignor. It also makes explicit that payment to the assignor before notification, or payment to the assignee after notification, discharges the obligation." *Id.* cmt. 2 (West 2011). Thus, when NGP (the account debtor) was notified of the assignment of Jatex's net revenue to Security Bank, the net revenue was owed to the bank. Furthermore, NGP's later payment of the net revenue to Security Bank discharged NGP's obligation to pay the withheld net revenue. *See* 6A C.J.S. *Assignments* § 107 ("Payment of a debt to an assignee entitled to payment constitutes a valid discharge of the indebtedness."). Accordingly, Appellees were entitled to summary judgment on Appellant's claims for the withheld revenues attributable to the deepening costs of the Vaqueros 47 No. 1 Well.

16

*Hannifin Trust—One-Percent Interest*

Jatex also asserted a breach of contract claim for accrued revenues attributable to a 1% interest that was the subject of a recorded Letter Agreement that Jatex executed with the Robert & Maxine Hannifin Trust on January 20, 2013. Under the terms of the Letter Agreement, the Trust agreed to pay $933,133.78 to Jatex "in exchange for" a 1% working interest in the subject leases, including the leases in the Clyde Prospect. The Letter Agreement further provided that the 1% interest was "being purchased" by the Trust. Security Bank subsequently executed a partial release of lien for this 1% working interest on February 5, 2013. NGP paid revenues attributable to the 1% interest to the Trust after the execution of the Letter Agreement.

Appellees assert that the Letter Agreement constituted a conveyance of the 1% interest to the Trust to the effect that Jatex no longer owned the 1% interest. Conversely, Appellants assert that the Letter Agreement only created a lien in favor of the Trust on the 1% interest. Appellants contend that the Letter Agreement did not constitute a conveyance because it did not provide that it was "an assignment."

Based on the terms of the Letter Agreement, we conclude that it was a conveyance of the 1% interest irrespective of the fact that it did not say that it was an assignment. The Letter Agreement states that the Trust was purchasing the 1% interest. The Letter Agreement was recorded in the public deed records, and the signatures of the parties signing on behalf of the Trust and Jatex were acknowledged before a notary. The Letter Agreement constituted a conveyance of the 1% interest because the grantor and grantee can be ascertained from the instrument, there are operative words or words of grant showing a present intention by the grantor to convey title to a real property interest (which is sufficiently described) to the grantee, and it is signed and acknowledged by the grantor. *See Green v. Canon*, 33 S.W.3d 855, 858 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

17

The Letter Agreement contains language concerning a lien, but that language pertains to Jatex granting a lien to the Trust on all interests owned by Jatex, including the 5.25% working interest retained by Jatex, as well as Jatex's proportionate share of production from the Clyde Prospect. In this regard, the Letter Agreement provided that the parties executed it in contemplation of Jatex quickly selling its 5.25% interest along with the 1% interest conveyed to the Trust and that the Trust would receive a minimum of $1,119,760.05 for "a guaranteed minimum of 20% return on investment." Accordingly, Appellees were entitled to summary judgment on Appellants' claims for the 1% interest conveyed to the Robert & Maxine Hannifin Trust.

*Recovery for "Foreclosure Damages"*

The bulk of the damages sought by Appellants is the value of the mineral interests that Security Bank foreclosed upon. As noted previously, Security Bank purchased the mineral interests at the foreclosure sale for $1,500,000.[5] As reflected in Truitt's valuation, Appellants asserted that the mineral interests were worth much more than $1,500,000.

Appellees asserted that Appellants had no evidence of damages on any of their claims. Appellants relied exclusively on Truitt's valuation for the calculation of their foreclosure damages. In our disposition of Appellants' first issue, however, we have determined that the trial court did not err by striking Truitt's valuation.

Appellants assert that there is additional summary judgment evidence that supports a valuation in excess of $1,500,000 for the foreclosed mineral interests. Specifically, they cite documents attached to Appellees' motion for summary judgment: (1) a letter from Jatex to Security Bank dated May 22, 2014, and (2) a "loan history" bank statement from Security Bank. Appellants cite *Timpte*

---

[5] At the time of foreclosure, the amount of Appellants' indebtedness to Security Bank was $1,928,617.63.

*Industries, Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009), and *Binur v. Jacobo*, 135 S.W.3d 646, 651 (Tex. 2004), for the proposition that documents attached to a no-evidence motion for summary judgment can be considered to create a fact issue that defeats the motion.

Appellees attached the loan history as evidence to their combined motion for summary judgment. However, Appellants did not direct the trial court to the loan history in their response to the motion as a matter to defeat the no-evidence motion for summary judgment. We held in *Smith v. Directru Assets Management, L.L.C.* that an appellant may not point to such evidence, for the first time on appeal, to raise a genuine issue of material fact to defeat a no-evidence motion for summary judgment. No. 11-17-00249-CV, 2019 WL 4135469, at \*2 (Tex. App.—Eastland Aug. 30, 2019, no pet.) (mem. op.) (citing *B.C. v. Steak N Shake Operations, Inc.*, 532 S.W.3d 547, 551 (Tex. App.—Dallas 2017), *reversed on other grounds*, 598 S.W.3d 256 (Tex. 2020)). "Although the nonmovant may not be required to resubmit the evidence already proffered by the movant at trial, the nonmovant must, at a minimum, file a timely response identifying the portions of the movant's evidence that the nonmovant is relying on to show that fact issues exist." *Id.*

The comment to Rule 166a(i) specifies that the nonmovant has the burden to "point out" the evidence that defeats each challenged element of a no-evidence motion for summary judgment. TEX. R. CIV. P. 166a(i) cmt.; *see MaximusAlliance Partners, LLC v. Faber*, No. 05-13-01688-CV, 2015 WL 707033, at \*5 (Tex. App.—Dallas Feb. 17, 2015, no pet.) (mem. op.) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206–08 (Tex. 2002)). As explained by the Dallas Court of Appeals:

> The issue is whether the trial court must search through all of the non-movant's evidence to determine if a fact issue exists without any guidance concerning what evidence creates an issue on a particular element. Under the Rules of Civil Procedure, the party seeking to avoid

the effects of a well-pleaded no-evidence motion for summary judgment bears the burden to file a written response that raises issues preventing summary judgment, and that points to evidence supporting those issues. Where the nonmovant fails to meet that burden, the trial court is not required to supply the deficiency, but instead must grant the motion.

*Chambers v. Allstate Ins. Co.*, No. 05-15-01076-CV, 2016 WL 3208710, at *12 (Tex. App.—Dallas June 9, 2016, pet. denied) (mem. op.) (quoting *Burns v. Canales*, No. 14-04-00786-CV, 2006 WL 461518, at *6 (Tex. App.—Houston [14th Dist.] Feb. 28, 2006, pet. denied) (mem. op.)). As noted by the Fourteenth Court of Appeals, the trial court is not required to search the record for evidence raising a material fact issue without more specific guidance from the nonmovant. *Moon Sun Kang v. Derrick*, Nos. 14-13-00086-CV, 14-13-00088-CV, 2014 WL 2048424, at *7 (Tex. App.—Houston [14th Dist.] May 15, 2014, pet. denied) (mem. op.). "In the absence of any guidance from [the nonmovant] as to where the evidence can be found, neither we nor the trial court is required to sift through a voluminous record in search of evidence to support [the nonmovant's] argument [that] a fact issue exists on any challenged element." *White v. Calvache*, No. 05-17-00127-CV, 2018 WL 525684, at *4 (Tex. App.—Dallas Jan. 24, 2018, no pet.) (mem. op.).

Because Appellants did not cite the loan history in their response as evidence of their damages, they cannot rely on the loan history to defeat the no-evidence motion. With respect to the May 22, 2014 letter from Jatex to Security Bank, Appellants cited the letter in their response to the motion for summary judgment. As discussed below, Appellants cited the letter in support of their cause of action for tortious interference with a contract. However, Appellants did not cite the letter as evidence of their "measurement of damages." To the contrary, Appellants relied exclusively in their response on Truitt's valuation of the mineral interests to support

20

their measurement of damages for the value of the mineral interests that Security Bank foreclosed upon.

Moreover, we disagree that the loan history or the May 22, 2014 letter constituted evidence of the fair market value of the mineral interests that Security Bank foreclosed upon. The loan history shows some of the payments that Jatex made on its loan with Security Bank. However, the loan history does not show the source of the funds that Jatex used to make those payments, and it contains no information about the value of any mineral interests.

The May 22, 2014 letter was a proposal by Truitt on behalf of Jatex for Security Bank to apply 100% of the revenue from the secured mineral interests to the loan. Truitt's letter contained his estimate of the amount of revenue that would be generated and his projection that the loan would be paid off in three years at "current[6] cash flow levels." However, Truitt's letter did not contain a valuation of the secured mineral interests other than to say that he had not been able to sell the properties "for enough to get us whole," despite his efforts to do so.

Neither the loan history nor Truitt's letter applied a capitalization rate to determine the present value of the secured interests. The application of a capitalization rate is an element of the income approach for determining fair market value. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001). Accordingly, there was no summary judgment evidence raising a fact issue that the value of the mineral interests that Security Bank foreclosed upon exceeded the amount paid by the bank at the foreclosure sale.

---

[6]Appellees' valuation expert noted that the price of oil had dropped from over $100 a barrel on June 1, 2014, to $47.22 on January 6, 2015. He opined: "This rapid decline in price caused liquidity problems throughout the industry. The loss of liquidity and the significant price decline reduced the value of oil and gas assets to a fraction of their prior value."

Appellees have presented an additional basis for excluding Jatex's damages as a result of the foreclosure. Appellees assert that the damages that Jatex seeks as a result of the foreclosure are consequential damages that were not foreseeable by NGP at the time that the parties executed the joint operating agreement. Appellees support this contention with the fact that Appellants did not obtain the loan from Security Bank until after the execution of the joint operating agreement. We agree with Appellees' contention.

Consequential damages are those damages that result naturally, but not necessarily, from a party's breach of contract. *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex. 2011); *Superior Broad. Prods. v. Doud Media Grp., L.L.C.*, 392 S.W.3d 198, 209 (Tex. App.—Eastland 2012, no pet.). Consequential damages are not recoverable unless the parties contemplated, at the time of contract formation, that such damages would be a probable result of the breach. *Basic Capital*, 348 S.W.3d at 901; *Doud Media*, 392 S.W.3d at 209. Thus, to be recoverable, consequential damages must be foreseeable and directly traceable to the breach and result from it. *Basic Capital*, 348 S.W.3d at 901; *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998); *Doud Media*, 392 S.W.3d at 209.

In their response to the motion for summary judgment, Appellants relied on a statement in Truitt's declaration that "[m]ost persons involved in this industry pledge their working interests as collateral for credit lines or loans in order to participate in additional oil and [gas] activity, and any operator is well aware of this." Based upon this statement, Appellants asserted that "it is almost expected in the oil and gas business that holders of working interests pledge those interests as collateral for loans. Thus, NGP would naturally know that in the 'ordinary course of events' in the oil and gas business a failure to pay over to working interest holders what is owed could well imperil that collateral[.]" Appellants present a somewhat different argument on appeal. Rather than focusing on foreseeability at the time the joint

22

operating agreement was executed, Appellants emphasize that, at the time that Appellees breached the joint operating agreement by debiting Jatex's account for the deepening costs for the Vaqueros 47 No. 1 Well, Appellees should have reasonably foreseen that the act would have likely caused Security Bank to foreclose on the lien.

From a timing perspective, the foreseeability of consequential damages for a breach of contract is assessed at the time the contract is formed, not at the time that the contract is subsequently breached. *Basic Capital*, 348 S.W.3d at 901; *Doud Media*, 392 S.W.3d at 209. Accordingly, we disagree with Appellants' contention that Appellees' knowledge of Jatex's loan with Security Bank at the time that revenues were withheld for the deepening costs for the Vaqueros 47 No. 1 Well is relevant to the foreseeability analysis. Instead, the relevant focus is on what Appellees contemplated—at the time the parties executed the joint operating agreement—that Jatex's damages might be in the event of a breach in the future.

As noted previously, Appellants obtained the loan from Security Bank after the parties executed the joint operating agreement. While Appellees did not have to know the particular bank that Appellants might obtain a loan from, Appellees had to have reason to know at the time the joint operating agreement was executed that Jatex would be pledging its interest as collateral. *Basic Capital*, 348 S.W.3d at 903. There is no summary judgment evidence to this effect. We disagree with Appellants' assertion that every oil and gas operator executing a joint operating agreement should have reason to know that every working interest owner will be pledging its interest as collateral. This contention is so far-reaching that it would eviscerate the foreseeability requirement set out in *Basic Capital* for the recovery of consequential damages for breach of a joint operating agreement. We further note that Jatex is not just seeking to recover the value of its mineral interests subject to the joint operating agreement—it is also seeking to recover for mineral interests that were not subject to the joint operating agreement as consequential damages for a breach of the joint

23

operating agreement. However, there is no showing of Appellees' knowledge of Jatex's other mineral interests at the time the joint operating agreement was executed.

Accordingly, the trial court did not err in granting summary judgment in favor of Appellees on Jatex's breach of contract claim for the recovery of damages allegedly caused by the foreclosure.

*Tortious Interference with a Contract*

Appellees also asserted that there was no evidence supporting Appellants' claim for tortious interference with a contract. Appellants assert that Appellees tortiously interfered with an oral forbearance agreement that Appellants had with Security Bank. To establish a claim for tortious interference with an existing contract, a plaintiff must show the following: (1) that a valid contract exists and is subject to interference, (2) that the defendant willfully and intentionally interfered with that contract, (3) that the interference was a proximate cause of the plaintiff's injury, and (4) that the plaintiff incurred actual damage or loss. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017); *Duncan v. Hindy*, 590 S.W.3d 713, 726 (Tex. App.—Eastland 2019, pet. denied).

Appellees asserted that Appellants did not have evidence of a contract subject to interference. This contention focuses on the oral forbearance agreement that Appellants alleged in their response to the motion for summary judgment. Appellants asserted in their response that "[t]he bank orally agreed to refrain from foreclosure so long as it could receive Jatex's Clyde Prospect revenues directly from [Appellee] NGP." Appellants supported this proposition by citing Jatex's letter of May 22, 2014, to Security Bank. Appellants acknowledged that the letter set out a proposal to the bank by Jatex. They asserted that Security Bank "substantially accepted" the proposal, thereby creating a contractual addendum to the deed of trust. In his declaration, Truitt described the oral forbearance agreement as follows: "Jatex

24

reached a mutual oral understanding with Garth Wright, its loan officer at [Security Bank], that with the payments promised by NGP and other resources at Jatex's disposal, the bank would refrain from foreclosing on the collateral for the line of credit."

Appellees asserted at trial and on appeal that Appellants could not rely on an oral forbearance agreement because it violated the statute of frauds and was precluded by the express terms of the loan agreement. *See* TEX. BUS. & COM. CODE ANN. § 26.02 (West 2015). In response, Appellants contend that Appellees cannot invoke either the statute of frauds or the terms of the loan agreement because Appellees lack standing to complain about the enforceability of the alleged oral forbearance agreement. We agree with Appellants' proposition that Appellees' status as third parties to the alleged oral forbearance agreement precludes Appellees from challenging voidable defects in it. *See Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 664 (Tex. 1990), *superseded on other grounds by statute as recognized in Coinmach Corp. v. Aspenwood Apartment, Corp.*, 417 S.W.3d 909 (Tex. 2013) ("[M]ere unenforceability of a contract is not a defense to an action for tortious interference with its performance."); *Clements v. Withers*, 437 S.W.2d 818, 821 (Tex. 1969) (a contract held to be unenforceable under the statute of frauds may nevertheless serve as the basis for a tortious-interference claim); *see also Morlock, L.L.C. v. Bank of N.Y.*, 448 S.W.3d 514, 517 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (a third party lacks standing to challenge a voidable defect in a contract).

In addition to asserting that Appellants had no evidence of a contract subject to interference, Appellees also asserted that Appellants had no evidence that Appellees willfully or intentionally interfered with any contract. "To prevail on a tortious interference claim, a plaintiff must present evidence that the defendant interfered with a specific contract." *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Finlan v. Dallas Indep. Sch.*

25

*Dist.*, 90 S.W.3d 395, 412 (Tex. App.—Eastland 2002, pet. denied)). Furthermore, the plaintiff "must present evidence that some obligatory provision of a contract has been breached." *Id.*; *see Duncan*, 590 S.W.3d at 726. In other words, a plaintiff must produce some evidence that the defendant "knowingly induced one of the contracting parties to breach its obligations under a contract." *Funes*, 352 S.W.3d at 213. Thus, Appellants were required to show that Appellees induced Security Bank to breach some provision of the alleged oral forbearance agreement. *See El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421–22 (Tex. 2017) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995)); *Duncan*, 590 S.W.3d at 726; *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 803 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) ("A necessary element of the plaintiff's cause of action is a showing that the defendant took an active part in persuading a party to a contract to breach it.").

As we noted above, Appellees cannot rely on either the statute of frauds or the provisions of the loan agreement that prohibit oral modifications to its terms. However, Appellants must still show the terms of the oral forbearance agreement and must also show that Appellees induced Security Bank to breach an obligatory provision of the alleged oral forbearance agreement. Appellants have only made a general statement that they had an oral forbearance agreement with Security Bank. Appellants have not provided any details about the specific terms of the oral forbearance agreement or how Security Bank may have breached the oral forbearance agreement by proceeding to foreclose on the property. In the absence of this evidence, a no-evidence summary judgment is proper. *See All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532–33 (Tex. App.—Fort Worth 2009, pet. denied). Furthermore, Appellants have not alleged that Security Bank breached any provision of the oral forbearance agreement. To the extent that Appellees induced Security Bank "to do what it ha[d] a right to do is not actionable

26

interference." *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *Duncan*, 590 S.W.3d at 727.

In Truitt's May 22, 2014 letter, he presented a proposal to Security Bank to continue to hold all properties as collateral and "apply 100% of the runs to the outstanding balance on the note." However, Appellants had already assigned the runs to Security Bank, having done so in the original loan documents. Furthermore, Security Bank had already invoked the assignment of the runs by requesting Appellees in November 2013 to start paying the runs directly to Security Bank. Additionally, Truitt stated in his declaration that the oral forbearance agreement was based on the runs from the subject property being paid directly to Security Bank plus "other resources at Jatex's disposal." Appellants did not elaborate on these other resources or on whether they were paid to the bank as required by the alleged oral forbearance agreement.

By and through its attorney, Security Bank sent its final Notice of Default and Demand for Payment in a letter dated December 10, 2014. The bank asserted in this notice that Appellants were in default of a "$1,996,826.94 Promissory Note" dated May 27, 2014.[7] The bank asserted that this note "became fully due on November 27, 2014," and that Jatex owed the bank $1,928,617.63 under the note. Thus, the final notice of default indicates that the bank foreclosed upon the mineral interests pursuant to a note executed after the oral forbearance agreement was purportedly made. Accordingly, Appellants have not shown that Security Bank breached any contract that it had with Appellants. The trial court did not err by implicitly

---

[7]We note that the $1,996,826.94 Promissory Note was executed five days after Truitt's letter of May 22, 2014. A copy of it that was attached to Appellants' petition indicates that it was a "term promissory note" that provided for five monthly installments of "one hundred percent (100%) of [Appellants'] Oil and Gas Proceeds as defined [in the note]" beginning on June 27, 2014, and continuing until November 27, 2014, when the remaining unpaid balance "on this Note shall be due and payable."

determining that Appellants did not present evidence raising a genuine issue of fact to support their claim of tortious interference with a contract.

We overrule Appellants' second issue challenging the summary judgment.

*This Court's Ruling*

We affirm the judgment of the trial court.

JOHN M. BAILEY

CHIEF JUSTICE

August 20, 2020

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[8]

Willson, J., not participating.

---

[8]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.